UNITED STATES DISTRICT COURT DISTRICT
OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:25-cr-00114-KAD-1 |
| | ) | |
| -v- | ) | |
| | ) | |
| SASHA MAY | ) | January 26, 2026 |

## <u>DEFENDANT SASHA MAY'S MEMORANDUM OF LAW IN AID OF SENTENCING</u>

There are at least nine substantial reasons to confer a lenient sentence on Defendant Sasha May:

1.  Ms. May merits a lenient sentence because she represents a very low risk of recidivism;

2.  Ms. May deserves leniency based on her exceptional rehabilitation and her treatment requirements;

3.  Ms. May deserves leniency because of her Autism and many other disabilities;

4.  Ms. May warrants leniency because the treatment and programming that she requires is not available in anything like the very positive, integrated and intense forms she receives now from highly qualified providers;

5.  Ms. May deserves leniency because of the extreme vulnerability she would face in prison;

6.  Ms. May deserves leniency because of the substantial deprivation of her liberty to which she has already been subjected during the past year-and-a-half;

7.  The Court should vary downward to account for the parties' reasonable guidelines expectations at the time of the plea, where the presentence report's calculation is materially higher than contemplated by both sides.

8.  Ms. May deserves leniency relative to her Guidelines exposure because of the profoundly flawed and inflated nature of the child pornography guidelines; and

9.  The Court may impose a lenient sentence here without undue concern regarding deterrence.

## I.    Ms. May Merits a Lenient Sentence Because She Represents a Very Low Risk of Recidivism.

First, Ms. May represents a very low risk of recidivism.  The empirical record in this case is unusually clear. Independent psychological testing, expert evaluation, the Sentencing Commission's own studies, Sasha's remarkable psychological stabilization and growth, a year-and-a-half of flawless home confinement, and an integrated, well-planned program of treatment for the future, establish that this defendant presents an exceptionally low risk of reoffending, notwithstanding her offense conduct ███████████.

Federal courts routinely hold that reduced sentences on that basis are appropriate. *See, e.g., United States v. Dorvee,* 616 F.3d 174, 183–85 (2d Cir. 2010) (vacating child pornography sentence where the district court assumed future sexual dangerousness without record support; holding that public-protection and recidivism assessments under § 3553(a)(2)(C) must be evidence-based, not speculative)*; United States v. Jenkins,* 854 F.3d 181, 189–92 (2d Cir. 2017) (reversing child pornography sentence where the court relied on generalized deterrence and public-protection concerns untethered to the defendant's individualized risk profile); *United States v. Tutty,* 612 F.3d 128, 132 (2d Cir. 2010) (recognizing district court authority to vary from § 2G2.2 on policy grounds where the Guidelines overstate seriousness and danger, including assumptions bearing on recidivism); *United States v. Sawyer,* 672 F. App'x 63, 66–67 (2d Cir. 2016) (summary order) (vacating child pornography sentence where the record did not support an exaggerated assessment of future dangerousness or need to protect the public); *cf. United States v. Rivers,* 50 F3d 1126 (2d Cir. 1995) (recognizing downward-departure discretion where the career-offender consequences overstate the "likelihood of recidivism," and holding the court may reduce criminal history category, offense level, or both to reflect a lower-that-typical recidivism risk). The same conclusion appears nationwide. *See United States v. Autery*, 555 F.3d 864, 875 (9th Cir. 2009)

("thus, the court impliedly found that the other people he had sentenced for 'ordering this sort of pornography' posed a greater threat to society than does Autery. As a result, this consideration is valid under § 3553(a)(1), and it was a reasonable basis for concluding that Autery's sentence should be lower than other defendants who do fit that profile," and such consideration supported a downward variance to probation); *United States v. Smith*, 275 F. App'x 184, 186–87 (4th Cir. 2008). This Court should follow suit.

As summarized by Dr. Eric Imhof, our forensic sexual offender risk specialist, "[h]er risk, using a combination of empirically guided clinical judgment and dynamic risk assessment[,] indicates that she is a low risk (see Risk Assessment section beginning on page 24) for future sexual offending." Specialized Treatment and Assessment Resources, P.A. (Drs. Eric Imhof and Kimberly Spence), *Psychological Evaluation: May, Sasha Elizabeth*, Nov. 19, 2025, Exhibit 1 hereto submitted separately under seal ("STAR Psychological Evaluation" or "STAR Report"). Dr. Imhof has worked with both the defense community and the Government, and is one of the country's preeminent experts in assessing the risk posed by sexual offenders.  His CV is appended hereto as Exhibit 2 – along with that of his partner in authoring the STAR Report, Dr. Kim Spence, who is a renowned expert on autism in law enforcement, has worked extensively with families of defendants under law enforcement supervision, and has also worked a great deal directly with law enforcement.  His opinions – and those of Dr. Spence – deserve weight in the eyes of the Court.

Dr. Imhof writes at length of his various approaches to assessing Sasha's risk, which, again, he adjudges to be low.  The Court has the STAR Evaluation, and we refer the Court to Dr. Imhof's thorough analysis in six pages of single paced type starting at page 24.  *See* Exhibit 1, submitted separately under seal.  We do not copy here verbatim or summarize in detail.  We merely note that Dr. Imhof comes to his conclusion of Sasha's low risk for future sexual reoffending based

on both meta-analysis of empirical and dynamic studies, as well as intense scrutiny of the facts known about Sasha. We highlight here just a few of the relevant findings.

First, it bears emphasis that Sasha is a non-contact offender. Not only is there no known history of any contact offense by Sasha, as noted in the STAR Report, Sasha has undergone rigorous polygraph examination which uncovered no indication of a contact offense. *See* STAR report at 19-20, Exhibit 1 hereto, submitted separately under seal. This is significant as the statistics reflecting recidivism are far more promising for offenders that only engaged in CSEM [Child Sexual Exploitation Material], without contact – such as Sasha.

Specifically, Dr. Imhof notes, empirically, that one study indicates "[o]nly 1.3% of subjects in samples of offenders that only engaged in CSEM offenses [such as Sasha] reoffended with a contact sexual offense, 5.3% of the subjects reoffended with a non-contact sexual offense, and 4.4% of the subjects reoffended by commission of a CSEM offense during the same follow up periods [of 4.1 and 5.9 years]." Exhibit 1, submitted separately under seal, at 25.

He also notes the results of a metanalytic study including "the largest sample to date," which found miniscule empirical risk of those meeting Sasha's profile of having CSEM possession exclusive offense conduct:

> A metanalytic study published in August 2025 which included thirty studies and a total of 25,978 subjects, the largest sample to date, found that, ***for child sexual exploitation material (CSEM) possession exclusive offenders, 0.56% reoffended with a contact offense, 3.14% reoffended with another CSEM offense, and 3.23% reoffended with any non-contact offense (including CSEM) over an average follow up period of 4.7 years.*** The authors noted that offenders who have both contact and CSEM offenses were fifteen times more likely to reoffend with a contact offense than CSEM possession exclusive offenders. The authors further noted that the results did not support the application of the gateway hypothesis (the theory that engaging in lower level/less harmful offenses will ultimately escalate to higher level/more severe offenses) to CSEM offending.

*Id.* at 26 (emphasis added).

4

Based on the foregoing, among other things, he concludes that *for Sasha specifically "the associated risk to commit a future contact sexual offense is considered to be between 0.5% and 3.6%, a non-contact sexual offense between 1.5% and 5.3% and a CSEM offense between 2.3% to 7.0% between approximately six to ten years, with the most recent research suggesting the lower end of these ranges are more applicable to CSEM-exclusive offenders."* *Id.* (emphasis added).

Dr. Imhof, moreover, extends his analysis to examination of Sasha's chats. Based on available scientific literature, Dr. Imhof concludes that, given the chat communications that were provided in the discovery, Sasha, again, has a relatively lower likelihood to engage in contact offending:

> While the online communications between Sasha and the undercover agent as well as others are of concern, the empirical literature has not identified on-line communications or "chats" as a validated risk variable in the development of standardized actuarial risk assessment or structured professional judgment tools. An extensive review of available literature on the topic of chats and its relationship to sexual offending revealed a focus on the chats directly between the offender and the victim or potential victim with an absence of studies examining the chats between two individuals communicating about the sexual abuse of a third person. While this research does not directly relate to the facts and alleged facts surrounding Sasha's case, certain themes are evident in this body of research that may be worthy of consideration in Sasha's case.

*Id.* Dr. Imhof summarizes "[t]he predominant themes in the body of literature which differentiate those offenders who engage in chats only or 'fantasy' offenders versus actual 'contact' offenders . . . ." *See* Dr. Imhof's specific analysis of the characteristics of chats that point in the direction of fantasy-driven offenders, versus contact offenders. *Id.* at 29-30. He concludes that *"[c]omparing the chat communications provided in the discovery to this body of research suggests Sasha is a fantasy driven offender with a lower likelihood to engage in contact offending*." *Id.* (emphasis added). Among other things, this conclusion is reinforced by the fact that after ostensively making

a plan to actually meet the undercover officer and his fictional daughter, Sasha never showed up, and, in fact, never communicated again with the undercover officer.  PSR 18.

Indeed, the Sentencing Commission's own research – embraced by federal courts – shows exceptionally low sexual recidivism rates for first-time possession-only offenders, as discussed further below. For instance, in *United States v. R.V.*, 157 F. Supp. 3d 207, 240, 267 (E.D.N.Y. 2016), the court specifically noted the Sentencing Commission's findings showing exceptionally low sexual recidivism rates for possession-only offenders and relied on that data in holding that § 2G2.2 exaggerates dangerousness. *Id.* (relying in part on Commission's data concerning low sexual recidivism rate (citing U.S. Sentencing Comm'n, *Federal Child Pornography Offenses* (Dec. 2012) at 310) in support of a downward variance for a possession-only defendant, to probation). In 2021, the Commission issued a report focused on this subject, and explicitly finding that non-production offenders' sexual recidivism rate was just 4.3 % over three years, and contact recidivism rate just 1.3%, *see* U.S.S.C., *Federal Sentencing of Child Pornography: Non-Production Offenses* (June 2021) – undoubtedly among the lowest for any federal offender class. *See United States v. Huseth*, No. 2:18-cr-20027-JAR, 2021 U.S. Dist. LEXIS 203827, *37-*39 (D. Kan. Oct. 22, 2021) (granting a downward variance to a noncustodial sentence in a possession-only case; expressly citing the U.S. Sentencing Commission, *Recidivism of Non-Production Child Pornography Offenders* (2021); noting Commission findings that sexual recidivism was 4.3% and contact sexual recidivism was 1.3%, and concluding that these empirical findings undermined the Guidelines' assumption of a high future risk even for first time offenders and supported leniency under § 3553(a)).

Moreover, as stated in the STAR Report, "some studies have indicated individuals who participate in community supervision in conjunction with mental health treatment focused on sex

offense issues [as Sasha is currently undergoing] reoffended 64% less than those individuals who did not participate in these services.  Additionally, those offenders who complete a comprehensive treatment program [as Sasha is currently planning to participate in at an even more intense level than currently] are up to 37% less likely to commit a sexual offense in the future.  Therefore her participation in treatment will further mitigate her already low risk."  STAR Report at 32, Exhibit 1 hereto, submitted separately under seal.

It also bears emphasis that Sasha, despite her autism, her psychological maladies, her history of trauma, and her manifold other issues, has nonetheless maintained complete stability, compliance, and pro-social functioning throughout the pendency of this case while on release. As discussed further below, this remarkable rehabilitation – from a place of intense darkness and antisocial trajectory to a path of positivity – weighs in favor of clemency in its own right. But we note it here because it also underscores the minimal risk of re-offense that the defendant, through her hard work and commitment to healing, has created for herself.

In that light, Sasha's candor – with her evaluators and, now, with the Court, through release of her experts' report – bears emphasis. She should not be punished for her candor, or revelations of conditions or dark pathways once taken or for the reasons proffered therefor. Sasha has been immensely brave in owning these problematic aspects of herself, and that accountability – the first step toward any recovery—should be welcomed, not punished. With that attitude of accountability and recovery at the fore of her functioning now, she takes a giant step toward reducing any reversion to anti-social conduct, and instead moves toward healing and acceptable thinking and conduct.  Indeed, the experts' report, and in particular the appended report of her SO treatment provider, Stefan Simanovich, LCSW, shows her steady and well-developed trajectory toward pro-social attitudes and thinking, propelled by a frankness, willingness to address hard

topics, and commitment to putting in the time necessary to achieve her momentum of steady progress (two sessions per week with her SO therapist alone, on top of her numerous other care and wellness activities).  *See* STAR Psychological Evaluation, Appendix B thereto.[1]

Aspects of this rehabilitation are also captured in poignant terms by Sasha's father, Stephen May:

> Since my retirement in January of 2025 Sasha and I have regularly spent about 20 hours a week together in the car. Not surprisingly, I've gotten to know my daughter much better and learned many things about her I hadn't known before. Most notably I've learned a little bit more about her inclusion on the Autism Disorder Spectrum. It's confusing, confounding and difficult to describe. She can be summarizing, rather scholarly, a chapter from Dracula that she just completed with her therapist one moment and the next moment will move to discussing some Anime graphic novel she's reading, or a Lego diorama that she's recently completed. But perhaps the most revealing thing Sasha has shared with me over the year we've spent together in the car is her musical tastes. It's rather eclectic, not bad although not my cup of tea. But two themes recur again and again in the music she listens to. The first one is loneliness and isolation. The other is a longing to not be isolated and lonely. This has been revealing to me. Sasha doesn't want to be isolated and alone. She wants to be a part of something. Our family, a friend group, the community. She's had a difficult time cracking that code but she's working on it and getting better. Little by little.
>
> ….
>
> That Sasha has made significant progress through the work she's done over these last 18 or so months with this talented and compassionate support group has been noticed by everyone in her orbit. Her attorney, James Smart, her therapists, Melina Wald, Karolyn Prisciandaro, Stefan Simanovich, Carolina Zerrate, Kim Spence and Eric Imhoff have all seen it and spoken of it. As the individual who has perhaps spent more alone time with Sasha than anyone else, I can tell the Court that I've seen it. Sasha is at long last recognizing that she might have a future in which she can grow, become educated, make a contribution and maybe even find happiness. Something that has very much eluded her to this point. Incarceration of any length or type would interrupt the hard and productive work she's been doing, halting her progress and likely returning her to the emotional

---

[1] It should also be noted, as Dr. Spence writes, that even apart from Sasha's work in therapy, ██████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ STAR Report, at 32, Exhibit 1 hereto, submitted separately under seal.

state that took her to the very dark places that resulted in the commission of her
crime. We've done plenty wrong as Sasha's parents and siblings, but we've seen
the promise of having a second chance.

Letter from Stephen May, included in Exhibit 3 hereto.

Also related to this point is the fact that Sasha's care routine is not happenstance or a one-off; rather, with the help of STAR, she has formulated a care routine that is not only rigorous, but well targeted (in light of her low risk even currently), well planned, well integrated and well-coordinated –to keep her moving ever further from her dark chapters, and ever farther down the road of positive thinking and conduct.  For example, Dr. Spence introduces the plan thus:

> Given her low risk, Sasha presents as an ideal candidate for community-based
> treatment and will benefit from highly specialized interventions and supports
> necessary to reduce the potential for a future occurrence of behavior(s) of concern.
> Court ordered sanctions should coincide with a treatment plan consisting of a
> combination of individual therapy sessions, explicit instruction and the
> development of appropriate executive functioning management techniques and the
> teaching of necessary social skills. Additionally, the utilization of resources for
> treatment of maladjusted social ███████ behavior and the development of
> reasonable criteria to address meaningful behavioral changes over time is
> recommended.

STAR Report, Exhibit 1 hereto, submitted separately under seal, at 34.

This plan is laid out in detail in the recommendations section of the STAR report. *See*
Exhibit 1 hereto submitted separately under seal. Significantly, the plan includes not only
continued bi-weekly sessions with her SO provider; but also: ongoing sessions with her
psychologist to support her mental health needs and transgender support needs; ongoing sessions
with a psychiatrist to continue her regimen of medication to treat, *inter alia*, her depression, anxiety
and potential suicidal ideation, continued sessions with her speech pathologist "to provide Sasha
with language (expressive/receptive), social and executive functioning interventions," *id.* at 33;
and "targeted intervention to improve" social network skills, understanding of behavior that is
never acceptable, creation of appropriate friendships or intimate relationships, reading of

nonverbal cues, and identification and practice of social solutions to challenging interactions; continued gender reaffirming care; and vocational rehabilitation programming. *Id.* at 34-40. And equally significant, it includes a coordinating element through the involvement of a "case manager," who has already been identified – namely, for interim period, at least, Dr. Kim Spence herself;[2] and it includes, through the guidance of that case manager and coordinated input from all providers, creation of a comprehensive treatment plan with specified, measurable behavioral objectives. *Id.* All elements of this plan are already in place, and the plan has already yielded significant benefits in the form of Sasha's stabilization and the significant progress as demonstrated, in, for instance, the report of her SO provider appended to the STAR Psychological Evaluation. *See id.* at Appendix B thereto.

Moreover, this routine of intensive committed care shall continue – beyond sentencing and beyond service of whatever sentence the Court imposes. Her family not only recognize the need for ongoing support for the services Sasha needs to stay oriented on the right trajectory, but they also have the intention and the means to ensure that such remains the case on an ongoing basis

---

[2] To expand upon Dr. Spence's credentials – as indicated by her CV attached at Exhibit 2 hereto, Dr. Spence is the Clinical Director of Autism Support Services for Specialized Treatment & Assessment Resources and has worked for the Center for Autism and Related Disabilities (CARD) at the University of Central Florida (UCF) since 1999 as an Autism Disorders Specialist. For the past 20 years she has lectured internationally regarding assessment, treatment supports, specialized therapeutic intervention, and the creation of specialized sexuality education programs for individuals with Autism Spectrum Disorders (ASD). Dr. Spence began providing specialized sexuality education training for parents, teachers, and care providers of individuals with ASD in 2000 and has offered numerous trainings focused on discriminating between maladaptive sexual behaviors versus mental health issues and specialized educational and behavioral interventions to support healthy sexual knowledge for individuals with ASD across the life-span. She has been training emergency responders, law enforcement personnel, and members of the criminal justice system across the nation since 2001 and is an appointed Advisory Board Member of the Florida Department of Law Enforcement (FDLE) Missing Endangered Persons Information Clearinghouse (MEPIC). Dr. Spence serves as a consulting editor for the peer-reviewed journal *Intellectual and Developmental Disabilities (IDD)* and on the Florida Developmental Disabilities Council (FDDC)/Florida Atlantic University (FAU) Training First Responders (Law Enforcement Officers & Emergency Medical Staff) Grant Advisory Committee. She been teaching at the University of Central Florida (UCF) as an adjunct since the early 2000's; she teaches educators and speech and language pathologists and has mentored numerous Ph.D. students over the years

into the future.  This is evident from the letters of support written by those in the family and those

who know the family best (attached at Exhibit 3):  family friend Kathleen Christensen writes that

from her adoption, "Sasha [has been] … a deeply loved member of the Sloan-May family and the

Pelham community," and "her parents have the resources to ensure that Sasha will have the care

that she currently receives, far into the future," *id.*; "Uncle Pat" Murphy writes, "Pam and Stephen

[Sasha's parents] have always been there for Owen/Sasha and obtained the help needed to try and

correct [Sasha's disabilities and challenges]…. As a family member Sasha will have our support,

and we will be there for her in good times and in bad." *Id.* And sister Mary Paranac writes at length,

and very informedly, on this topic:

> Sasha's struggles began in early childhood with speech and academic challenges in school. At the time, I was starting my own career as an elementary school teacher, and I observed and admired my parents' tireless efforts to ensure Sasha had the best teachers, best school settings, and best specialists to support her unique learning differences. Their decisions for and with Sasha have always been rooted in research, external expertise, and love for Sasha.
>
> This same framework guides them today.
>
> Sasha, now an adult, faces serious mental health issues that have impacted our family to its core. My parents, my brothers and I all understand, without question, that these are challenges that Sasha will face for the remainder of her life. Our family, including Sasha, is collectively committed to ensuring Sasha's safety and health, that she is an uplifting part of the fabric of her family and community, and that she continues on an upward trajectory.
>
> Indeed, since the events of August 2024, my parents have ensured that our family band together to guarantee that the rule of law is enforced, that Sasha participates in research-based rehabilitative programs and services, and that our family unit remains strong and supportive of Sasha and of each other.
>
> Judge Dooley, as you consider the best next steps for Sasha, please know that she has a united, highly capable and committed family behind her.

*Id.*  In the words of Sasha's mother, "[w]e know that, in addition to our love and support, Sasha

requires serious professional emotional therapies, and we are committed to providing them until

the day she leaves this world.  We will never let down our guard or assume that 'this is all behind

her,' . . . . [L]est the Court think these are hollow promises, together, my husband, our three other children and I have discussed Sasha's long-term emotional and financial support. With the full support of Sasha's sibling, my husband and I are putting in place an estate plan that includes a Special Need trust, into which just about the entirety of our estate will go so that after we are gone, Sasha's needs will still be met. Sasha's brother, Michael Paranac, will be the Trustee." Letter from Pamela Sloan, in Exhibit 3 hereto.

> As further explained in the letter from the family's trust and estate counsel:

>> During their lifetimes, Ms. Sloan and Mr. May will continue to fully support Sasha financially. Ms. Sloan is a partner at a prominent New York City law firm and Mr. May is a retired schoolteacher. My office is preparing new estate planning documents for Ms. Sloan and Mr. May, through which they will provide significant financial support to Sasha after their deaths. Upon their deaths, Ms. Sloan and Mr. May are making a significant bequest to a trust that will be solely for Sasha's benefit, and which will be controlled by an independent Trustee. The Trustee will have broad discretion to make distributions for Sasha's benefit, but must prioritize ensuring Sasha's continued access to treatment. Sasha will not be able to directly access or manage the Trust assets, but must rely on the Trustee to provide the financial support she needs.

*See* Letter from Lawrence Blumberg, Esq., Exhibit 4 hereto.

> Finally, the Court's own findings in this case support the view that Sasha presents minimal risk. Upon her plea in this matter, the Court allowed Ms. May to continue her stay outside of incarceration, under home detention. ECF No. 51. Significantly, the Court found at that juncture, in light of many of the foregoing considerations, by "clear and convincing evidence that [Ms. May would] . . . not likely . . . pose a danger to the safety of any other person or the community." 18 U.S.C. Section 3143. With even more time passed without violation of terms of release, with an even longer history of successful, integrated treatment, with even further stabilization personally, now, such a finding may be even more confidently rendered.

## II.    Ms. May Deserves Leniency Based on Her Exceptional Rehabilitation and Her Treatment Requirements.

Second, relatedly, this defendant—who, again, has ASD, a trauma-based psychiatric profile, unique vulnerabilities related to her transgender status, and multiple learning disabilities— has nonetheless maintained complete stability, compliance, and pro-social functioning throughout this case. Her clinical presentation, expert assessments, and actual performance closely track the circumstances in which courts have determined that downward adjustment in sentencing is appropriate considering the defendant's exceptional rehabilitation. *See, e.g., Gall v. United States,* 552 U.S. 38, 59–60 (2007) (affirming probation-only sentence where district court found that no term of imprisonment was necessary and that any term of imprisonment would be counterproductive in light of defendant's post-offense rehabilitation); *Pepper v. United States*, 562 U.S. 476, 480–82, 492 (2011) (approving reliance on post-sentencing rehabilitation and reciting district court's conclusion that "it would not advance any purpose of federal sentencing policy to send [the defendant] back to prison")*; United States v. Blake*, 89 F.Supp.2d 328, 344-45 (E.D.N.Y. 2000) (rehabilitation demonstrates reduced recidivism risk, which would likely end up higher were defendant incarcerated); *cf. United States v. Preacely*, 628 F.3d 72, 81-82 (2d Cir. 2010)("In this case, evidence of rehabilitation was particularly relevant to determining whether the Career Offender Guideline was appropriate. There was compelling evidence that Preacely embarked on a three-year course of rehabilitation, showing both his desire and his potential to live a productive life. By the government's own admission, he went above and beyond the conditions of his release. The district court was required, as a procedural matter, to consider the evidence of Preacely's rehabilitation") *see also id.* at 84 (*Lynch, J.*, concurring)(remand appropriate in light of district court's failure to consider defendant's claims of rehabilitation); *United States v. Hernandez,* 604 F.3d 48, 55-56 (2d Cir. 2010) (district court must consider substantial post-offense

rehabilitation and other mitigating considerations including low recidivism risk in imposing sentence).

Sasha's rehabilitation is not only significant—it is protective. Since her arrest, she has engaged in intensive, interdisciplinary treatment addressing trauma, executive-functioning impairments, and the psychological sequelae of severe stress, ostracism, abuse and harassment. Empirical and clinical indicators show meaningful gains in emotional regulation, social functioning, and coping behaviors. The Supreme Court in *Pepper v. United States* made clear that rehabilitation is highly relevant because it shows that the likelihood of future criminal conduct has decreased. 562 U.S. 476, 491–93 (2011). Numerous courts agree that sustained, documented rehabilitation reduces the need for incapacitation. *See, e.g., Gall*, 552 U.S. at 59, and other cases cited in preceding paragraph.

In this light, it must also be borne in mind that this rehabilitation is based on hard work in an intricately balanced wellness and recovery program (over 100 biweekly sessions with Stefan Simanovich, her SO provider, alone, since her arrest; *see* Appendix B to STAR Report, Exhibit 1 hereto (Stefan Simanovich, LCSW, *Sasha May, Sex Offender Treatment Update and Plan,* at 48); and another comparable number of biweekly sessions with her speech and cognition specialist, Karolyn Prisciandaro, MA, CCC-SLP,  Appendix C to STAR Report, Exhibit 1 hereto (Karolyn Prisciandaro, MA, CCC-SLP, *May, Sasha Elizabeth*, at 58); as well as countless additional treatments with her long-time psychologist, Dr. Melinda Wald, her psychiatrist, Dr. Caroline Zerrate, and newly commenced sessions with executive functioning and social skills coach, Dr. Amy Fritz.) As Mr. Simanovich states of Sasha's hard work, substantial progress and vulnerability:

> Sasha exemplifies genuine therapeutic engagement and accountability. She poses minimal risk when engaged in appropriate treatment but significant risk of deterioration without treatment and social support. She is essentially receiving treatment that should have been provided years ago, addressing long-standing

trauma and identity issues that contributed to her offending. Her transformation
includes improved family relationships, abstinence from substances, engagement
with neurodivergent community group therapy, regular exercise and openness to
employment and education. She presents with noticeable improved mood and
affect, taking full responsibility for her actions while actively working to
understand and heal the underlying factors…. Her sustained commitment to
addressing core psycho-sexual issues through evidence-based treatment represents
a significant protective factor against future offending.

Appendix B to STAR Report, Exhibit 1 hereto (Stefan Simanovich, LCSW, *Sasha May, Sex
Offender Treatment Update and Plan,* at 50).

The letter from Sasha's speech pathologist – who has worked with Sasha since
approximately age 10 – similarly speaks to Sasha's nadir before the arrest, and her steady ascent
through deliberate vigor in her healing efforts since that time:

> I first met Owen May when he was in middle school. At that time, he was a vulnerable
> and self-conscious adolescent facing profound and complex challenges that significantly
> affected every area of his development. These included severe childhood apraxia of speech;
> receptive and expressive language disorders; multiple learning disabilities, including dysgraphia
> and significant reading and writing impairments; and substantial executive functioning deficits
> involving attention, processing, and organization. Academically, he was functioning at least five
> years below grade level in both reading and writing.
>
> From a clinical standpoint, Owen presented with extremely low muscle tone and one of
> the most persistent and treatment-resistant articulation disorders I have encountered in my
> professional practice. Despite years of intervention within the public school system, he made
> minimal functional or academic progress, and meaningful remediation was not achieved. His
> parents consistently reported concerns regarding social isolation, difficulty forming friendships,
> and a growing sense of discouragement and withdrawal.
>
> . . . .

Despite consistent family support and extensive intervention, Sasha continued to experience significant social and emotional challenges. Chronic isolation, limited independence, and delayed social development contributed to clinically significant anxiety and depression. These struggles must be understood within the context of a young person who had spent years navigating systems that repeatedly fell short of addressing her needs.

Over the past year and 3 months, I have observed a profound and sustained transformation in Sasha's motivation, engagement, and sense of personal agency. She has shifted from passive participation to active investment in her own growth and future. She now demonstrates genuine curiosity, initiative, and pride in her accomplishments. Most notably, she has learned to write in both print and cursive over the past year—skills she now uses as a functional means of communication since technology is unavailable. This represents a breakthrough, particularly given that prior attempts to teach these skills years earlier were unsuccessful due to emotional and motivational barriers rather than ability.

Sasha now approaches learning with perseverance, even when faced with difficulty. She is actively engaging in structured self-assessment, exploration of strengths, and identification of interests and aptitudes through systematic tools and guided support. For the first time, she is developing a realistic and hopeful understanding of how her abilities may align with future vocational paths that include both earth and social sciences, for example, Geology, Conservation, and Archeology.

Sasha's family has been instrumental in reinforcing therapeutic goals, maintaining structure, and supporting her compliance with treatment. Their guidance, supervision, and emotional support provide critical protective factors and create a stable home environment that reinforces her ongoing rehabilitation.

I am fully convinced that Sasha is on a positive and sustainable trajectory toward emotional stability, psychological well-being, and functional independence. Over the past year, she has demonstrated meaningful insight, accountability, and a sincere commitment to personal growth. While her offense was serious, her recent behavior reflects rehabilitation rather than risk. With strong family support and an engaged therapeutic team, she has shown a consistent willingness to participate in treatment and self-improvement.

Letter from Karolyn Prisciandaro, in Exhibit 3.

Perhaps the observations of her own mother capture the transition most touchingly:

I assure Your Honor that these therapies have tapped into the Sasha we always suspected was buried inside her body: a friendly, more social person who now sits at the dinner table with us and engages in discussions; a person who now comes downstairs when neighbors come to visit; a person who now asks her father and me if we want to join her in a board game or to watch a movie; a person who now talks about her feelings, about wanting friends and about getting a job "when I have made up for what I did;" a person who, without being asked, voluntarily does chores around the house and in the yard; a person who participates in the planning and preparation of enjoyable (and sometimes delicious) family meals.

On Thanksgiving Day, we, like many families, went around the table with each guest saying what he/she was most grateful for this year. When it was Sasha's turn, without skipping a beat, she said: "I'm grateful I have a family that loves me and supports me. I'm so sorry for what I did to everyone. I hope you can forgive me. I love you. Thank you."

Certainly, we are not the only people whom Sasha should ask for forgiveness. Sasha knows that the children depicted in the images are victims, and that every time the images are viewed, they are victimized again. But as we understand it, Sasha cannot directly ask forgiveness of the children depicted in the images, or of their families. Nonetheless, we have talked about how she can ask for forgiveness in a spiritual way, and that she must do so, forever. She agrees.

We are convinced that the work Sasha is doing – work that should continue, perhaps forever – has enlightened Sasha in many ways. She now shows empathy for others. She now shows interest in other people and what makes them happy. She now expresses understanding of right and wrong. In short, she is venturing out of herself and her dark, lonely, private life and sharing herself with us.

Letter from Pamela Sloan, in Exhibit 3 hereto.

Given her gender dysphoria, ASD-related sensory and cognitive vulnerabilities, and trauma history, the rehabilitation achieved here is not only particularly remarkable: it is fragile, the product of a stable, interdisciplinary, intensive, and specialized outpatient structure that cannot be replicated in custody. As Mr. Simanovich states, "Incarceration would likely undo over one year of meaningful therapeutic progress." *Id. (*and see *id.* at 49 for more comments on the risks to Sasha and her progress that would be posed by incarceration). As Counselor Prisciandaro also spells out in detail, only a small amount of which is repeated here:

[I]ncarceration would pose serious risks to Sasha's health, development, and long-term well-being. Her neurodevelopmental profile includes multiple cognitive, developmental and linguistic challenges. I believe her growth is best supported in safe, structured and supportive environments rather than in restrictive or high-stress settings that lead to worsening mental health conditions.

Appendix C to STAR Report, Exhibit 1 hereto (Karolyn Prisciandaro, MA, CCC-SLP, *May, Sasha Elizabeth*, at 59).

III.     **Ms. May Deserves Leniency Because of Her Autism and Other Maladies.**

Third, courts across the country recognize that Autism Spectrum Disorder ("ASD") is a profoundly mitigating condition because it diminishes culpability, reduces recidivism risk, fundamentally alters the meaning of punishment, and creates extreme vulnerability in custody.[3] Moreover, ASD's essential features—lifelong social ostracism, impaired social judgment, rigidity, obsessive tendencies, and profound isolation—create a predictable pathway by which individuals can be drawn into unhealthy, pathological, or "dark" online environments they neither sought out nor understood in the way a neurotypical person would. When these conditions converge with trauma, learning disabilities, speech and language deficits, gender dysphoria, stigma and identity-degrading rejection, the causal chain becomes even clearer.

ASD mitigates culpability because it is clinically defined by rigid, detail-focused thinking and impaired ability to interpret social cues, interpersonal intent, and contextual meaning, which in turn distorts an individual's understanding of social behavior and consequences, particularly in emotionally charged or ambiguous situations.  DSM-5-TR at 56–59 (defining ASD by persistent deficits in social communication and restricted, inflexible patterns of thinking and behavior); Baron-Cohen, Simon. "Mindblindness: An Essay on Autism and Theory of Mind," *MIT Press*, 1995, pp. 21–45; Happé & Frith, "The Weak Coherence Account," 18 *J. Autism Dev. Disord.,* 121, 122–25 (2006). The consequence, often, is that the individual with ASD simply does not fully understand the victimization and hurt inflicted on the children featured in the images. *See, e.g., United States v. Huseth*, 2021 U.S. Dist. LEXIS 203827, *4 (D. Kan. Oct. 22, 2021) ("he is not a

---

[3] The Sentencing Guidelines do not expressly reference autism or autism spectrum disorder, but they expressly authorize consideration of mental and emotional conditions and diminished capacity, *see, e.g.,* U.S.S.G. §§ 5H1.3 (mental and emotional conditions), 5K2.13 (diminished capacity), provisions under which courts routinely evaluate ASD-related impairments when determining departures and variances.

neurotypical person and, without any explicit explanation, could not fully appreciate that the children involved were horrifically abused physically, mentally, and emotionally"; imposed probation with treatment tailored to ASD as "sufficient, but not greater than necessary"); *United States v. Knott*, 638 F. Supp. 3d 1310, 1317 (M.D. Ala. 2022) ("people with ASD often lack the ability to make the inferences that allow neurotypical people to understand, without being told, that child pornography is harmful to children and socially unacceptable. These include inferences that, to neurotypical people, may seem obvious; for instance, some people with ASD are unable to intuit that objects and people depicted in photographs exist (or once existed) in real life. People with ASD also often lack the ability to take the perspectives of others and are severely limited in their ability to read facial expressions, both of which deficits may make it difficult for them to consider, without direct explanation, how an actual child would experience being forced to participate in the creation of the material being viewed.") (Internal quotation marks and footnotes omitted); *United States v. Castle*, No. 2:20-cr-223, 2025 U.S. Dist. LEXIS 140830 (M.D. Ala. July 23, 2025) (downward variance to time served; opinion discusses defendant's autism/learning disabilities and notes alignment with other ASD child-porn sentences including *Huseth* and *Knott*).

The empirical evaluations in this case make clear that Sasha suffers versions of these same deficits – versions, that, indeed, are complicated even further through her own victimization, trauma, and outsider status.  The STAR Report states:

> One of the defining features of Autism Spectrum Disorder (ASD) is impairment in social interactions and is often the result of difficulties in interpreting or 'reading' the verbal and non-verbal social communications from others in ways that align with normative societal expectations. These impairments are often attributed to a core deficit in Theory of Mind (ToM), a deficit reflected in the diminished ability to take the perspective of others to such a degree their behavior undermines the individual's ability to interact in ways that are generally considered appropriate and adaptive for a particular social context.  During the interview, Sasha struggled to understand the logical or possible perspectives of others and

was unable to offer age-appropriate insight regarding commonly accepted social/emotional behavior of others. Polite conversation about unimportant or uncontroversial matters, often referred to as "small talk" is an informal type of discourse that does not cover any functional topics of conversation but is necessary in developing and maintaining acquaintances, friendships, or romantic relationships. In addition to the reports of others in previous evaluations and treatment notes, Sasha was observed in the interview to demonstrate limited insight regarding her difficulty when interacting with others in this manner. She acknowledged she had struggled with social situations and was unable to articulate how she might improve this situation.

STAR Report, Exhibit 1 hereto, filed separately under seal, at 33.

Indeed, that Sasha suffers from core deficits in ToM is underscored by the pattern in her teens and young adulthood of "victim[ization by] online adult sexual predators," STAR Report at 31, Exhibit 1 hereto, filed separately under seal; PSR paragraph 61, and her skewed perception of that abuse. As noted in the STAR Report, she "perceived [the abuse] to be validation and support from others online." *Id.* As discussed further below, that dynamic led her further into the dark pathways of the darkest parts of the internet, and, as also discussed further below, she only came to recognize the victimization for what it really was through hard work with a skilled SO therapist. The point here is that her mistaking victimization for validation underscores the diminished culpability here, insofar as it highlights her ToM deficits: based on her own perception of her own experiences, she undoubtedly did not have the insights and perspicacity to properly and fully recognize the wrongfulness of the victimization of the children shown in the CSEM she interacted with—by the other adults featured, creating, or distributing the material, or by herself.

Moreover, the clinical evaluation in this case documented a lifelong history of bullying, rejection, and social ostracism, a pattern that the empirical literature consistently recognizes as disproportionately prevalent among individuals with ASD. Trundle, G. et al., "Prevalence of Victimisation in Autistic Individuals: A Systematic Review and Meta-Analysis," *Trauma, Violence*

*& Abuse*, Oct; 24(4), 2282-2296 (2023);  Zeedyk, S. M., Rodriguez, G., Tipton, L. A., Baker, B. L., & Blacher, J. "Bullying of Youth with Autism Spectrum Disorder, Intellectual Disability, or Typical Development: Victim and Parent Perspectives," *Research in Autism Spectrum Disorders,* Vol. 8, Issue 9, 1173–1183 (2014); Mazurek, M.O. et al., "Social Media Use Among Adults with Autism Spectrum Disorders," *Computers in Human Behavior,* Vol. 29, Issue 4, 1709, 1709–1714 (2013); Autism Speaks, *Internet Safety and Autism* (recognizing that individuals with ASD often retreat into online environments that provide predictability or anonymity, and are particularly vulnerable to harmful online communities due to impaired social judgment and difficulty distinguishing healthy from unhealthy interactions).  Consistent with this body of research, Sasha's immersion in unhealthy online spaces is best understood as a maladaptive response to disability-driven social impairment and chronic victimization, not as evidence of predatory intent or future dangerousness—particularly where courts and empirical authorities have cautioned against inferring future sexual risk from online conduct alone, and where the specific risk assessment conducted by Dr. Imhof points toward minimal future risk by Ms. May. U.S. Sent'g Comm'n, *Recidivism Among Federal Sex Offenders* 23–30 (2012); U.S. Sent'g Comm'n, *Non-Production Child Pornography Offenders* 28–31 (2021); *Dorvee*, 616 F.3d at 184–86; *Huseth*, 2021 U.S. Dist. LEXIS 203827, *37-*39; *c.f. United States v. D.M.*, 942 F. Supp. 2d 327 (E.D.N.Y. 2013) (maladjusted, introverted, immature young person with little social contact given five year probationary sentence for child pornography offenses in light of promising risk assessments and assiduous work in therapy); STAR Report at 19-30, Exhibit 1 hereto filed separately under seal.

    We need not speculate whether such considerations took Sasha down this dark pathway. In the words of Drs. Spence and Imhof, after comprehensive review of Sasha's extensive medical and psychological records, and after evaluation of her in person at length:

Sasha presents with a complex psychosexual developmental history (see Sexual Development section beginning on page 6) psychosocial history (see Educational History section beginning on page 12 and Family/Social Background section beginning on page 15) and mental health history (see Previous General Treatment section beginning on page 8) *which is directly related to the offense behavior*. Sasha was born a biracial, biological male in Texas to a mother who abused multiple substances while pregnant with him. She was subsequently adopted at birth by her current family and was relocated to suburban New York City. Multiple communication and learning disorders were identified early in her life for which she received numerous interventions; however, Autism Spectrum Disorder (ASD) was not identified and remained unrecognized and treated until early adulthood. Sasha struggled both academically and socially as a child, often being the subject of ostracization. As Sasha entered puberty, she began to struggle with gender identity, confusion regarding her sexuality, transgender issues. She experienced poor self-esteem, significant anxiety, and significant depression. Sasha found what she perceived to be validation and support from others online as a young adolescent; however, in reality she was the victim of on-line adult sexual predators. This victimization was only perpetuated during her transition from a male to a female and following her gender affirming surgery, as she described others on-line would attempt to groom her for sexual interaction due to her transgender status. While Sasha has had a lifetime of interventions to address a variety of issues (see Previous General Treatment section beginning on page 9), it is clear these attempts were not well coordinated among her providers, many of whom were not aware of the scope of her physical and mental health conditions or ASD and Sasha did not receive comprehensive intervention that was systematically coordinated or inclusive of her many presenting issues until after her arrest.

STAR Report, Exhibit 1 hereto, submitted separately under seal, at 1-2 (emphasis added).

Sasha's ASD -- compounded by her trauma, victimization, ostracization, learning disabilities and loneliness -- "is directly related to the offense behavior." *Id.*

As stated by neighbor Lawrence Wechsler, who has known her and the family for years, and seen first-hand that loneliness and desire to belong:

> But the main thing about Sasha was her extreme shyness, and in retrospect her clearly aching loneliness.  She began spending most of her time in her attic room, extraordinarily creatively it should be noted, fashioning ever more impressive Lego dioramas.
>
> I am convinced—and here I think I can speak for the neighborhood as well—that the catastrophic events that were to ensue had their origins in that awkward aching loneliness and the yearning to be accepted in a peer community I would guess that she was going along with the group out of a deep-seated desire and need just to be part of any group.  I cannot imagine that Sasha ever would have taken part in any sort of abusive physical behavior toward any person, let alone a child.

Letter from Lawrence Weschler, attached at Exhibit 3; *see also* Letter from relative Edward Sloan, attached at Exhibit 3 (emphasizing Sasha's "loneliness and vulnerability, … naivete yet genuine care and strong determination to do the right thing").

Furthermore, as explained further below, incarceration is uniquely harsh and even dangerous for individuals with ASD, such as Sasha. This vulnerability alone is a recognized basis for downward variance, as the Second Circuit explained in *United States v. Lara*, 905 F.2d 599, 603 (2d Cir. 1990), where the court accepted unusual susceptibility to abuse in prison as a mitigating factor.

Finally, courts consistently conclude that community-based treatment is more effective and more humane for ASD defendants than incarceration. *See, e.g., Huseth,* 2021 U.S. Dist. LEXIS 203827, *46 ("In fact, the universal view among the experts is that Huseth would benefit *most* from treatment, and that any risk of recidivism can be more appropriately addressed through treatment than incarceration"); *Knott,* 638 F. Supp. 3d at 1321 ("These abuse-related considerations are further buttressed by the fact that Knott, given the specific circumstances of his ASD, is vulnerable to decompensation if held in a prison setting. In particular, the court finds credible the expert testimony that Knott is likely to decompensate--and to experience mental deterioration--if he is not able to receive the same frequency and quality of mental-health treatment

that he has received in the community."); *Castle,* 2025 U.S. Dist. LEXIS 140830, *18-*20 ("The United States Probation Office, as directed by the court, will facilitate access to necessary resources and support, including continued treatment for mental health, autism spectrum disorder, and sex offenders.    There appears to be no meaningful treatment program in the Bureau of Prisons specifically for a person with Mr. Castle's multiple disabilities. It is therefore reasonable to conclude that to provide him with needed educational and medical care, his present circumstances should not be interrupted by incarceration in a general federal prison population; that would be the least effective alternative.  On the other hand, the last 'need' suggested in this § 3553(a) factor is 'other correctional treatment,' also 'in the most effective manner.' § 3553(a)(2)(D). The court finds that, based on Mr. Castle's unique circumstances, the need for treatment would be best served outside prison walls and the most effective correctional treatment under all the circumstances is not incarceration (which the court finds is the least effective alternative). Harking back to the need to provide 'just' punishment, the court finds that, under all the § 3553(a) factors, the only just punishment is continuation of supervision *in situ*—not a full shutdown of not only demonstrably effective treatment but several of the other 'dynamic variables' (employment, home, family, and community support, *etc*.). . . . What is 'just' is also what is 'needed' here."). These cases dovetail with the broader §3553(a)(2)(D) principle that sentencing should provide necessary treatment "in the most effective manner." For ASD defendants, the most effective manner is almost never prison. It is structured therapy, psychiatric support, social-skills work, and a stable environment—conditions that reduce risk, promote growth, and align with the evidence-based approach federal courts increasingly adopt in connection with non-contact child pornography cases.

When ASD, lifelong social ostracism, trauma, gender dysphoria and  multiple other maladies and disabilities, and identity-based rejection converge, the pathway into maladaptive digital spaces is not a sign of heightened culpability—it is a sign of vulnerability. The ASD brain, deprived of social belonging and exposed to chronic rejection, often seeks refuge in virtual communities without the judgment needed to navigate them safely. This explanatory model is a basis for mitigation because it demonstrates diminished culpability, low recidivism risk, heightened vulnerability to punishment, and a compelling need for community-based treatment. Under the reasoning of the authorities cited in this section, the ASD-ostracism-internet pathway strongly supports a downward variance, which is fully consistent with §3553(a)'s requirement, as applied here, that a sentence be "sufficient, but not greater than necessary."

IV.    **Ms. May Warrants Leniency Because the Treatment and Programming that She Requires Is Not Available in Anything Like the Very Positive and Intense Forms She Receives Now, from Highly Qualified Providers.**

Fourth, as alluded to above, the treatment that Sasha requires simply does not exist in the Bureau of Prisons in anything approaching the form, intensity, or gender-competent quality she receives now. Courts have consistently held that where community-based psychological and psychiatric treatment is demonstrably more effective than prison programs at reducing recidivism—and where custody would interrupt successful therapy—a downward variance is warranted. *United States v. Autery*, 555 F.3d , 864, 876–78 (outpatient therapy superior to BOP offerings, and district court's "conclusion that Autery's prospects for rehabilitation are greater out of prison than in is not unreasonable," justifying in part variance from the low end of the guidelines range of 41 months to 5 years' probation for child pornography possession offense); *United States v. Flowers*, 946 F. Supp. 2d 1295 at 1299 (M.D. Ala. 2013) (prison lacked meaningful treatment, "The evidence at Flowers's sentencing showed she suffers from multiple untreated psychiatric

disorders which affect her judgment and decision-making. These disorders contributed to the instant offense as well as to her past crimes . . . . There was further evidence that Flowers would be more amenable to mental-health treatment in her community and that prison would exacerbate her mental illness," probation imposed over Government objection); *United States v. Stern*, 590 F. Supp. 2d (N.D. Ohio 2008) 945, 958-959 ("There is no suggestion that this defendant would be more fully rehabilitated within the prison system. . . . *Cf. United States v. Hawkins*, 380 F. Supp. 2d 143, 165 (E.D.N.Y. 2005), *aff'd*, 228 Fed. App'x 107 (2d Cir. 2007) (concluding that any incarceration 'will in effect doom her…. Rehabilitation should not now be destroyed by wanton and unthinking application of mechanical rules for imprisonment.')"). These decisions comport with the principal that a court may reduce a sentence where incarceration would destabilize health and treatment. *See, e.g., United States v. McFarlin*, 535 F.3d 808, 811–12 (8th Cir. 2008) ("a court may give a non-prison sentence if the defendant is 'seriously infirm' and it would be 'as efficient as, and less costly than, imprisonment.'"). Here, as discussed above and referenced repeatedly in the STAR Report and its appendices from Sasha's treatment providers, the combination of gender-affirming medical needs (including the dilation procedures essential to her health, discussed more fully in certain of the letters and in the STAR Report, Exhibits 3 & 1 hereto), ASD-related vulnerabilities, and trauma-focused therapy makes uninterrupted, specialized outpatient care not simply beneficial but essential. We have outlined above some of the specialized, integrated treatment Sasha receives. More discussion of same is available in Dr. Spence's writing in the STAR Report, Exhibit 1 hereto, *Treatment Recommendations,* at 34-40.

The preceding section of this memo discussed this reality for defendants who have even mild ASD, alone. All the more so is this true for a defendant, like Sasha, who suffers ASD requiring substantial support (level 2), with accompanying language impairment, gender dysphoria,

transgender identity issues, social anxiety disorder, generalized anxiety disorder with panic attacks, severe, recurrent major depressive disorder, ████████████████████████████████████ ████████████████████████████████████████████████████████, receptive and expressive language impairment, verbal apraxia, dyspraxic syndrome, truncal hypotonia, reading disorder, disorder of written expression, sensory processing issues, and fine and gross motor incoordination – and who, yet, poses a negligible risk of sexual recidivism, next to no risk of contact recidivism, and who has adhered to her carefully coordinated treatment plan with no violation of conditions of release for 18 months.  *See* STAR Report at 22-30, Exhibit 1 hereto, submitted separately under seal. As Dr. Spence writes, this sort of complex, integrated therapy will not be available to Sasha within BOP:

> This precise combination of qualified interventions with ASD-qualified personnel to target and examine the potential role of contributing factors related to autism, poor sense of self, and executive functioning skills (e.g., managing stress and./or anxiety and seeking assistance when needed) as well as intensive support for social learning will not be available to Sasha within the prison system.  As these deficits may have, in part or collectively, had a role in her judgement and decision making in the alleged offense behavior, the absence of the precise combination of treatments will delay adequate intervention, reducing effectiveness of treatment.

*Id.* at 34.

In short, the public will be protected to the degree that home confinement with mandated treatment is maximized and incarceration minimized. Measure for measure, home confinement—with mandated treatment—will protect the public more effectively than imprisonment, for custodial time will disrupt progress, heighten clinical risk, and produce poorer long-term outcomes for both the defendant and, therefore, the public. *Id.* at 30, 33-34, 48-60 (Report of Stefan Simanovich, LCSW), 59-60 (Report of Karolyn Prisciandaro, MA, CCC-SLP).

V.    **Ms. May Deserves Leniency Because of the Extreme Vulnerability She Would Face in Prison.**

Fifth, as again alluded to briefly above, Ms. May deserves leniency because of the extreme vulnerability that she would face in prison. The Court is permitted to vary downward where imprisonment would expose a defendant to unusual danger or extraordinary vulnerability, and the Second Circuit has long recognized this as a valid basis for mitigation. In *United States v. Lara*, 905 F.2d 599, 603 (2d Cir. 1990), the Court held that unusual susceptibility to victimization in prison is an appropriate ground for departure because the same term of imprisonment imposes far more severe punishment on a vulnerable defendant than on an ordinary inmate. This principle applies with full force to individuals whose neurodevelopmental disabilities and gender identity place them at heightened risk of abuse, exploitation, and psychological harm in a custodial setting.

Autism Spectrum Disorder creates core functional impairments—difficulty interpreting social cues, rigidity, sensory sensitivities, impaired threat perception, and an inability to navigate complex and coercive social hierarchies—that make prison environments uniquely dangerous. Federal courts have acknowledged that ASD magnifies custodial risk. *See, e.g., Knott*, 638 F. Supp. 3d at 1320-21 (granting downward variance; court found evidence that defendant's ASD not only "diminished his moral culpability" and contributed to offense conduct in child pornography possession case, but also increased his vulnerability in prison).

The same reasoning applies to transgender defendants, who face extraordinary and well-documented risks of physical and sexual assault in confinement. The Supreme Court acknowledged this reality in *Farmer v. Brennan*, 511 U.S. 825, 831–34, 847-50 (1994), observing that a transgender woman placed in a men's prison faced a "substantial risk of serious harm" and may be "particularly vulnerable to sexual attack."

"This population is uniquely vulnerable to attacks while incarcerated, data shows, . . . ." NPR, *Internal memo halts oversight of prison rape protections for trans inmates* (accessed December 9, 2025)(citing James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016), The Report of the 2015 U.S. Transgender Survey. Washington, DC: National Center for Transgender Equality; *see id.* at 184-196)). "Respondents who were held *in jail, prison, or juvenile detention in the past year faced high rates of physical and sexual assault by facility staff and other inmates. In the past year, nearly one-quarter (23%) were physically assaulted by staff or other inmates, and one in five (20%) were sexually assaulted. Respondents were over five times more likely to be sexually assaulted by facility staff than the U.S. population in jails and prisons, and over nine times more likely to be sexually assaulted by other inmates*." James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). The Report of the 2015 U.S. Transgender Survey. Washington, DC: National Center for Transgender Equality, p. 13 (emphasis added) <u>USTS Full Report - FINAL 1.6.17.pdf</u> (accessed December 9, 2025).

Moreover, policy changes by the Trump administration – that is, the extant Executive Branch represented by the very AUSA's in this case – have made this vulnerable population even more vulnerable. Issued on President Trump's first day in office for his second term, the Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (Jan. 20, 2025), ordered, *inter alia*, prison assignment based on gender at birth and discontinuation of gender reassignment medical care in BOP facilities.  Those changes have been mitigated temporarily through litigation by advocates for transgender rights. *See, e.g., Moe v. Trump*, Civil Action No. 25-10195-GAO, TRO (D. Mass. Jan. 30, 2025) (blocking transfer of a transgender woman to a men's prison and prohibiting termination of hormone therapy); *Doe v. McHenry,* No. 1:25-cv-00286-RCL, 763 F. Supp. 3d 81, 88-89 (D.D.C. Feb. 4,

2025) (TRO prohibiting enforcement of the transfer provisions of Executive Order 14168 as applied to the named plaintiffs; "With respect to the transfer provision, the plaintiffs cited to various government reports and regulations recognizing that transgender persons are at a significantly elevated risk of physical and sexual violence relative to other inmates when housed in a facility corresponding to their biological sex—which the defendants do not dispute."); *Kingdom v. Trump*, 25-cv-691, 2025 U.S. Dist. LEXIS 105237, Preliminary Injunction (D.D.C. June 3, 2025) (Lamberth, J.) (requiring BOP to continue gender-affirming treatment for all prisoners with gender dysphoria); *see also* M. Sisak, "Judge orders Trump administration to return two transgender inmates to women's prisons," *AP* (Mar. 19, 2025) (reporting that Judge Lamberth ordered two transgender women who had already been moved to men's prisons under the new policy returned to women's facilities and restored to treatment). Nevertheless, it is significant that the baseline administration policy remains assignment to facilities correlating to gender assigned at birth. (It is also significant that part of the courts' findings in these cases was that such women would face an unacceptable risk of harm, including sexual violence, if assigned to men's facilities. *See, e.g., McHenry,* 763 F. Supp. 3d at 88-89). As a result of these rulings, the very few transgender women who had earlier met the requirements for classification to women's facilities remain housed in federal women's prisons, and the administration's attempt to mandate wholesale reclassification has been temporarily halted where courts have found a substantial risk of serious harm, including sexual violence, in men's facilities.

However, not all aspects of the administration's push to eliminate protections for transgender people have paused. For instance, the administration has recently amended auditing standards under the Prison Rape Elimination Act ("PREA") that eliminate inspections specifically and categorically with respect to prison facilities' compliance with PREA standards related to

transgender individuals.  *See, e.g.,* 34 U.S.C. Section 30301(13) (Congressional finding that prison rape endangers vulnerable populations and undermines safety and rehabilitation); 28 C.F.R. Sections 115.31 (protects transgender inmates from cross-gender viewing and searches, requiring privacy safeguards and limiting exceptions to exigent circumstances); 115.41-43 (mandating intake screening for sexual-abuse risk, including specific consideration of vulnerability factors based on transgender status or gender nonconformity; restricting protective segregation of transgender inmates to last-resort and least restrictive conditions for protection, with ongoing review; and requiring immediate protective action where transgendered inmates face imminent sexual-abuse risk, without resort to punitive or indefinite isolation); 115.51 (requiring prisons to provide transgender inmates access to medical and mental-health services related to sexual abuse, including trauma-informed care and treatment responsive to heightened vulnerability); as well as Sections 115.401-405 (concerning PREA audits and auditors, who are licensed by the DOJ).

News outlets reported on these changes. *See, e.g.,* NPR, Internal memo halts oversight of prison rape protections for trans inmates : NPR (accessed December 9, 2025). The undersigned defense counsel then made discovery requests of the Government concerning the topic. We were told that pursuant to this quiet policy shift, "auditors should no longer look at those sections [of PREA and its underlying regulations and policies dealing with the prevention of sexual violence against transgender individuals] when determining an agency's compliance. . . . [to] ensure[] BOP institutions can still be found compliant with PREA audits, as they have been ordered to follow E.O. 14168 (which states, among other things, there are only two sexes and the federal government does not recognize transgender)."  Exhibit 5 hereto (forwarded email from Jessica Seaton, Ph.D., National PREA Coordinator, Federal Bureau of Prisons dated December 17, 2025). Further discovery requests for the memo itself led to the Government's assistance in

locating online in publicly available sources multiple copies of this memo:



**U.S. Department of Justice**

Office of Justice Programs

*Bureau of Justice Assistance*

―――――――――――――――――――――――――――――

*Washington, D.C. 20531*

**MEMORANDUM**

**TO:**         All DOJ-certified PREA Auditors

**FROM**:       Tammie M. Gregg
               Principal Deputy Director
               Bureau of Justice Assistance

**SUBJECT:**     National PREA Standards Alignment with Executive Order 14168

**DATE:**        December 2, 2025

―――――――――――――――――――――――――――――

On January 20, 2025, President Trump signed Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." ("E.O. 14168"). Section 2 of E.O. 14168 states that, "[i]t is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-

protective laws to promote this reality…"  Section 3 provides that "[e]ach agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes."

Portions of the PREA Standards are in conflict with the requirements in E.O. 14168, in particular, subsections that address the manner in which:

1)    transgender, intersex, and gender nonconforming inmates are to be screened for risk of victimization and how that screening information is to be used (Standards 115.41, 115.42, 115.241, 115.242, 115.341, and 115.342),

2)    transgender and intersex inmates are to be searched (Standards 115.15, 115.115, 115.215, and 115.315),

3)    transgender, intersex, or gender nonconforming inmates are to be communicated with (Standards 115.31, 115.231, and 115.331), and

4)    sexual abuse incident reviews should consider whether a sexual abuse incident was motivated by an inmate's gender identity or transgender or intersex identification or status (Standard 115.86, 115.186, 115.286, and 115.386).

The Department of Justice is currently updating the PREA Standards to align with the

requirements of E.O. 14168. Until these updates are finalized, and further guidance is provided,
effective immediately, applicable federal and non-federal correctional facilities shall not be held
to subsections of the PREA Standards that may conflict with E.O. 14168.

Accordingly, **all PREA auditors are instructed to immediately pause from making
compliance determinations for the following subsections of the PREA Standards, until
further notice:**

- 115.15(e) and (f)
- 115.115(d) and (e)
- 115.186(d)(2)
- 115.215(e) and (f)
- 115.231(a)(9)
- 115.241(d)(7)
- 115.242(c) through (f)
- 115.286(d)(2)
- 115.31(a)(9)
- 115.315(e) and (f)
- 115.331(a)(9)
- 115.341(c)(2)
- 115.342(c) through (g)
- 115.386(d)(2)
- 115.41(d)(7)
- 115.42(c) through (g)
- 115.86(d)(2)

DOJ Memo to PREA Auditors dated Dec. 2, 2025, Exhibit 6 hereto. This policy shift alone not

only underscores this administration's intentions of stripping transgender individuals, like Sasha,

of protections from violence in BOP facilities, but it also effectively reduces the protections.

Where ASD and transgender identity are present together, as they are here, the resulting

vulnerability is not merely cumulative but exponential. ASD impairs the ability to detect, interpret,

and respond to threats; transgender status dramatically heightens the likelihood of sexual and

physical violence; and the combination leaves the defendant unable to protect herself in a custodial

environment. As Dr. Spence spells out:

> Due to her Central Coherence Deficits, including social naiveite, Sasha is currently
> at significant risk of becoming a victim of abuse within a prison setting. As the
> result of her pragmatic communication challenges, social skill deficits, poor sense
> of identity, and gullibility, she struggles to understand non-verbal cues (gestures,
> expressions, body language, etc.) from others. Individuals with ASD such as Sasha,
> have difficulty quickly processing the subtleties of verbal and non-verbal
> communication and face extreme challenges in navigating social interactions which
> leads to passivity, manipulation by others and an inability to effectively defend
> themselves. In a prison setting where social hierarchies and power/control among
> inmates plays an important role in survival, a socially challenged individual such
> as Sasha would be an easy target for physical and sexual abuse. Add to these
> challenges, her recent transgender person status, years of victimization by others,

and trauma which have led her to becoming the victim of others without the realization she was being victimized.

Exhibit 1 hereto, STAR Report at 33-34.

In short, where a defendant's autism and transgender status expose her to extraordinary risk of harm in prison, a guidelines sentence would inflict punishment beyond what Congress contemplated and far greater than what §3553(a) permits. A downward variance is warranted to ensure that the sentence imposed remains proportionate, humane, and "sufficient, but not greater than necessary" to serve the purposes of sentencing.

## VI. **Ms. May Deserves Leniency Because of the Substantial Deprivation of Her Liberty to Which She Has Already Been Subjected During the Past Year-and-a-Half.**

Sixth, for the past eighteen months, Ms. May has lived under full-time GPS-monitored home detention, permitted to leave only for supervised walks and essential medical and psychological treatment: this degree of restriction constitutes a substantial deprivation of liberty that warrants consideration at sentencing. Federal courts have long held that extended home confinement is real punishment that may lessen the need for further incarceration. *United States v. Miller*, 991 F.2d 552, 554–55 (9th Cir. 1993) (home detention already served is "punishment" relevant to § 3553(a)); *United States v. Carpenter*, 320 F.3d 334, 344-45 (2d Cir. 2003) (district court may credit home detention previously served); *United States v. Romualdi*, 101 F.3d 971, 977 (3d Cir. 1996) (months of home confinement may warrant departure). The District of Columbia recently reaffirmed the principle plainly: "Home detention is still detention." *United States v. Pryer*, No. 1:22-cr-00260, 2024 U.S. Dist. LEXIS 41801, *19-*21 (D.D.C. Jan. 17, 2024).

The circumstances of this case make that eighteen-month period especially meaningful. Ms. May has lived under continuous monitoring and strict, court-controlled movement for a year

and a half—conditions that fall far outside typical pretrial supervision and reflect a serious punitive burden. Throughout that time, she has been fully compliant, stable, and consistently engaged in the treatment and oversight the Court ordered. This period of sustained restriction already serves the core goals of sentencing: punishment, deterrence, and accountability. See *Gall v. United States*, 552 U.S. 38, 48–59 (2007) (probation and community restrictions are "substantial" and may satisfy the purposes of punishment).

For these reasons, we respectfully request leniency. The Court may sentence with confidence that Ms. May has already endured significant punishment, and that she has complied flawlessly under highly restrictive conditions. A lenient sentence would reflect the punishment already served, the stability she has shown, and the mandate under § 3553(a) that no sentence be greater than necessary.

VII. **The Court Should Vary Downward to Account for the Parties' Reasonable Guidelines Expectations at the Time of the Plea, Where the Presentence Report's Calculation Is Materially Higher Than Contemplated by Both Sides.**

The Court here should vary downward under § 3553(a) to account for the parties' reasonable Guidelines expectations at the time of the plea, where the Presentence Report's calculation proves materially higher than the range contemplated by both sides. Although plea-agreement estimates are non-binding, the Second Circuit has recognized that a sentencing court may consider the circumstances of the plea and the defendant's reliance interest in determining whether a within-Guidelines sentence would be greater than necessary. *United States v. Palladino*, 347 F.3d 29 (2d Cir. 2003); *United States v. Griffin*, 510 F.3d 354 (2d Cir. 2007); *c.f., United States v. Habbas*, 527 F.3d 2666 (2d Cir. 2008); *United States v. Fernandez*, 443 F.3d 19, 33–35 (2d Cir. 2006) (emphasizing that a sentencing judge must consider all of the Section 3553(a) factors in determining a reasonable sentence). Here, the defendant entered a guilty plea against a shared understanding of the applicable Guidelines framework, and the PSR's substantially higher range—

driven by enhancements neither party anticipated—would dramatically alter the practical consequences of that plea. A downward variance to align the sentence more closely with the range reasonably contemplated by the parties would promote fairness in the plea process and result in a sentence sufficient, but not greater than necessary, to satisfy § 3553(a).

VIII.    **Ms. May Deserves Leniency Relative to Her Guidelines Exposure Because of the Profoundly Flawed, and Inflated, Nature of the Child Pornography Guidelines.**

Seventh, the Court need not give weight to §2G2.2 because it is one of the very few sentencing guidelines that did not arise from the Sentencing Commission's empirical analysis, benchmarking, or historical research. Unlike other guidelines—where the Commission drew on sentencing data, criminology studies, and historical practice—§2G2.2 is the product of repeated congressional directives responding to political pressure rather than empirical calibration. The Second Circuit, the Supreme Court, and several other courts of appeals have recognized this defect, and the case law is unusually unified in concluding that §2G2.2's structure makes its sentencing ranges far harsher than what §3553(a) contemplates for the typical non-production offender.

The strongest articulation of this principle remains the Second Circuit's decision in *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010). The court there explained that §2G2.2 is "fundamentally different" from guidelines crafted through the Commission's ordinary research-based processes because Congress repeatedly amended it by directive. The resulting combination of sharply escalated base offense levels and multiple enhancements that apply in most, if not all, cases, causes the guideline to irrationally skew sentences upward, at times producing ranges near or exceeding the statutory maximum for individuals with no criminal history and no contact conduct. *Dorvee* cautioned district courts against adopting the guideline uncritically because it is not the product of the Commission's institutional expertise, but rather the result of congressional

directives that created "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *Id.* at 188. That conclusion follows the Supreme Court's reasoning in *Kimbrough v. United States*, 552 U.S. 85 (2007), which held that when a guideline does not reflect the Sentencing Commission's empirical methodology, sentencing judges may vary based on a policy disagreement with it. *Dorvee* applies *Kimbrough* squarely to §2G2.2 and stands as binding authority that the guideline's structural defects render it an unreliable measure of culpability. *See also, United States v. Grober*, 624 F.3d 592 (3d Cir. 2010); *United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011).

The inescapable consequence of this history is that the enhancements embedded in §2G2.2—which were intended to serve as aggravating factors—have lost their differentiating function. Because nearly every offender now receives them, they fail to separate the ordinary case from the extraordinary one. *Dorvee* indicated that these enhancements apply so often and in such a mechanical fashion that they no longer measure true blameworthiness. Subsequent Second Circuit decisions have echoed that concern. In *United States v. Jenkins*, 854 F.3d 181, 189-91 (2d Cir. 2017), the court essentially indicated that §2G2.2 enhancements pile on to the point of absurdity and produce ranges far exceeding what §3553(a) requires. Enhancements for computer use, number of images, presence of prepubescent minors, and even sadistic content now apply to such a high percentage of defendants that they have ceased to carry the analytic meaning the Commission originally assigned to them.

The Commission's own research confirms the judiciary's concerns. In its landmark 2012 *Report to Congress on Federal Child Pornography Offenses*, the Commission concluded that §2G2.2 had become functionally obsolete. According to the report, the most severe enhancements apply in almost all cases, meaning the guideline no longer differentiates among offenders. The

report found that technological advances, especially the advent of digital storage and peer-to-peer file-sharing systems, have rendered image-count calculations—once thought to measure culpability— as well as image-type enhancements, unreliable. The Commission also found that the computer-use enhancement is meaningless in a digital era where virtually all offenders use computers. Fundamentally, the Commission concluded that the guideline had outgrown its intended function, consistently overstating seriousness and producing sentencing ranges that are far higher than what evidence-based corrections research would recommend.

Courts also recognize that §2G2.2 fails to reflect modern understanding of recidivism among non-production offenders, as discussed above. The Sentencing Commission confirmed this in its 2021 recidivism study, finding that non-production offenders have an extremely low sexual recidivism rate. *See* United States Sentencing Commission, *Federal Sentencing of Child Pornography: Non-Production Offenses* (June 29, 2021), at 65-66. These findings undermine the incapacitation rationale built into §2G2.2, further demonstrating that the guideline's severity is not tethered to evidence.

In sum, §2G2.2 is one of the rare guidelines that most important authorities have recognized as structurally unsound. It is not empirically grounded, it exaggerates culpability through enhancements that apply almost universally, it produces irrationally severe ranges for ordinary offenders, and it does not reflect the technological or criminological reality of contemporary child-pornography offenses. Congress's repeated top-down interventions prevented the guideline from developing according to the Commission's expertise, resulting in a framework that fails to measure what it purports to measure. Under the case law cited above, this Court is fully authorized to impose a sentence below the §2G2.2 range because the guideline simply does

not provide a reliable or just benchmark for determining what is "sufficient, but not greater than necessary," under §3553(a).

IX.     **The Court May Impose a Lenient Sentence Here Without Undue Concern Regarding Deterrence.**

Finally, in assessing deterrence under § 3553(a)(2)(B), courts consistently recognize that the difference between a short and a long custodial sentence has limited marginal deterrent value in non-production child-pornography cases, and that meaningful deterrence is achieved primarily through the certainty of detection, conviction, and lifelong consequences rather than the sheer duration of imprisonment. In *United States v. Autery*, the Ninth Circuit affirmed a probationary sentence because the district court reasonably concluded that the certainty of prosecution for failure to abide by the terms of probations and the lifelong stigma of conviction provided substantial deterrence, such that additional incarceration would not meaningfully increase deterrent effect. 555 F.3d 864, 874–76 (9th Cir. 2009). Similarly, in *United States v. Stall*, the Sixth Circuit upheld a one-day custodial term on the ground that the goal of general deterrence could be met by the very long (10-year) term of supervised release. 581 F.3d 276, 286–87 (6th Cir. 2009). These decisions reinforce that a sentencing court remains well within the mainstream when it concludes that meaningful general deterrence is already accomplished by consequences the defendant has sustained.

This assessment carries special force in cases governed by U.S.S.G. § 2G2.2, a guideline the Second Circuit has repeatedly found non-empirical and excessively severe, as discussed above. Under these authorities, the guideline's manufactured severity cannot be treated as a proxy for deterrent need.

Also, as noted, the Sentencing Commission's own findings in its 2021 report (U.S.S.C., *Federal Sentencing of Child Pornography: Non-Production Offenses* (June 2021)) show exceptionally low sexual recidivism rates for possession-only offenders, further highlighting that § 2G2.2 exaggerates dangerousness. As a result, neither public protection nor general deterrence requires severe incarceration when the empirical record establishes minimal risk of sexual re-offense.

With respect to individual deterrence, as discussed above, particularly with defendants suffering ASD, courts hold that demonstrated rehabilitation, psychological treatment, and sustained compliance with supervision meaningfully reduce the need for further incapacitation. *Cf., e.g., United States v. Robertson*, 662 F.3d 871, 879-880 (7th Cir. 2011) (remanding for consideration of a downward variance where the defendant's treatment progress and personal rehabilitation and characteristics established a low likelihood of recidivism). Here, the defendant has spent the last eighteen months on strict GPS-monitored home confinement, has complied flawlessly, has pursued psychological treatment, and presents a dramatically reduced risk profile— precisely the circumstances in which courts conclude that specific deterrence is already achieved.

Courts also accept that substantial restrictions, particularly prolonged home confinement, carry genuine punitive and deterrent force. *See, e.g., Carpenter*, 320 F.3d at 345, and other cases cited above. Those principles apply with full force here: eighteen months of GPS-restricted home detention, limited movement, continuous monitoring, and demonstrated compliance have already imposed substantial restraint and deterrence.

Taken together, the governing law shows that the statutory goals of deterrence—both individual and general—are already substantially satisfied and do not require the imposition of a

long custodial sentence, where the defendant suffers ASD, is in a non-production case and has

demonstrated stability, rehabilitation, compliance, and low empirical risk.

## **CONCLUSION**

For the foregoing reasons, the Court should impose a lenient sentence on Ms. May.

Respectfully submitted,
THE DEFENDANT,
SASHA MAY

By: */s/ James R. Smart*
James R. Smart  (ct20982)
Koch, Garg, Walker & Smart, LLP
169 Main Street, Suite 800-21
800 Plaza Middlesex
Middletown, CT 06457
Phone: 860-452-6860
Fax: 860-452-6865
james@kgwslaw.com

**<u>CERTIFICATE OF SERVICE</u>**

      I HEREBY CERTIFY that on January 26, 2026, a copy of the foregoing motion is being filed electronically and will be served by mail to any party unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic filing. Parties may access this filing through the Court's CM/ECF System.

                                  */s/ James R. Smart*
                                  James R. Smart  (ct20982)