Hon. Kari A Dooley

United States District Court for the District of Connecticut

915 Lafayette Blvd.

Bridgeport, CT 06604

Re: Sasha E. May

Dear Judge, Dooley,

    My name is Stephen May, and I am writing today in support of my daughter, Sasha May, whose case is before you and whose sentence you'll soon rule on.

    I'd like to begin by assuring Your Honor that we see Sasha's offense as a very serious one. We do not take this lightly, nor do we see this as a victimless crime. Innocent children were exploited in the making of the images that Sasha has plead guilty to possessing. We neither excuse nor minimize this offense. But we do believe that there are mitigating circumstances. A rather voluminous report has been created by Sasha's attorney, James Smart, and the team of therapists with whom Sasha has worked covering that mitigation. I'll try and avoid burdening the court further by discussing what's already in that report. Rather I'll write about my own experiences with and of Sasha since the day of her arrest, August 26, 2024.

    We learned of Sasha's arrest via a phone call while we were away on vacation on the Jersey Shore. The call came from the person Sasha was in a relationship with. It was a toxic relationship that, in my mind, had to have contributed to the commission of this crime by Sasha. In no way am I mentioning this to assign blame to anyone but Sasha. Rather, I want the court to understand that that relationship is now long over. In fact most of the conditions that Sasha lived under prior to her arrest are gone. She no longer lives in isolation on the 3rd floor of our house. She has re-engaged with her siblings, and yes, her parents too, who she had marginalized somewhat and who had also marginalized her. She now spends her time in our house's living area with us, sleeps in the bedroom right next to ours and has " re-joined" our family. She spends much of her time nowadays building with Legos (she's actually become quite accomplished) or in her therapy sessions or being taken to and back home from those sessions.

    On the day following Sasha's arrest she was released to our custody under house detention with very tough and restrictive terms. Ironically those rather harsh conditions have contributed mightily to the progress Sasha has made over time. It quickly

became clear that Sasha was going to have to work long and hard to begin to get well from this sickness, and that she was going to need lots of help and support if she were to succeed. As a family we determined that it would be necessary for me to retire from my career as a high school science teacher, a career that I loved and miss, so I could be available to be hands on. Sasha's two older brothers also made themselves available in the early stages. I mention this not because I'm looking for accolades, but rather to illustrate to Your Honor, that we, as a family, are a support system for Sasha, and that I am in this for the long haul.

Since my retirement in January of 2025 Sasha and I have regularly spent about 20 hours a week together in the car. Not surprisingly, I've gotten to know my daughter much better and learned many things about her I hadn't known before. Most notably I've learned a little bit more about her inclusion on the Autism Disorder Spectrum. It's confusing, confounding and difficult to describe. She can be summarizing, rather scholarly, a chapter from Dracula that she just completed with her therapist one moment and the next moment will move to discussing some Anime graphic novel she's reading, or a Lego diorama that she's recently completed. But perhaps the most revealing thing Sasha has shared with me over the year we've spent together in the car is her musical tastes. It's rather eclectic, not bad although not my cup of tea. But two themes recur again and again in the music she listens to. The first one is loneliness and isolation. The other is a longing to not be isolated and lonely. This has been revealing to me. Sasha doesn't want to be isolated and alone. She wants to be a part of something. Our family, a friend group, the community. She's had a difficult time cracking that code but she's working on it and getting better. Little by little.

I have many concerns about Sasha's future if she were to be incarcerated. Obviously the impact it would have on her mental health would be traumatic. It's not likely that the Bureau of Prisons has the resources to continue the counseling that has led to her progress nor to the administering the several medications that she relies on daily and the interruption of which could be catastrophic. Less obvious is the threat to her physical health. Sasha has had gender affirming bottom surgery. Called a vaginoplasty, it requires patients who have had that procedure to "dilate" their vaginas regularly using some sort of instrument proscribed by their doctor. Any interruption of this could lead to infection or the closing of it as the body tries to heal what it perceives as a wound. Again, it seems unlikely that the Bureau of Prisons would have the wherewithal to supervise or administer these almost daily requirements.

That Sasha has made significant progress through the work she's done over these last 18 or so months with this talented and compassionate support group has been noticed by everyone in her orbit. Her attorney, James Smart, her therapists, Melina Wald, Karolyn Prisciandaro, Stefan Simanovich, Carolina Zerrate, Kim Spence and Eric Imhoff have all seen it and spoken of it. As the individual who has perhaps spent more alone time with Sasha than anyone else, I can tell the Court that I've seen it. Sasha is at long last recognizing that she might have a future in which she can grow, become educated, make a contribution and maybe even find happiness. Something that has very much eluded her to this point. Incarceration of any length or type would interrupt the hard and productive work she's been doing, halting her progress and likely returning her to the emotional state that took her to the very dark places that

resulted in the commission of her crime. We've done plenty wrong as Sasha's parents and siblings, but we've seen the promise of having a second chance. Please find a way to help Sasha become a positive functioning member of her community by not putting her in jail.

                                            Very truly and respectfully yours,
                                            Stephen May

*Stephen T. May*

Hon. Kari A. Dooley
United States District Court for the District of Connecticut
915 Lafayette Blvd.
Bridgeport, CT 06604

Re: Sasha May

Dear Judge Dooley,

I am very pleased to write in support of Sasha May. I have known Sasha her entire life. I was with her family on the evening she, as a newborn, arrived home in Pelham, NY, with her mother Pamela Sloan, after her birth and adoption in San Antonio, Texas. It was an evening filled with joy and love, as she was embraced by her parents, Pamela Sloan and Stephen May; her siblings, Michael, Mary, and Brendan; and close family friends. From that moment on, Sasha was and remains a vital and deeply loved member of the Sloan-May family and the Pelham community.

While shy by nature, with gentle, child-like tendencies, Sasha has grown more comfortable in engaging in conversations, sometimes offering her own thoughts and opinions. I have seen her progress over the years as I regularly have joined the family at dinners, outdoor cookouts, and holiday celebrations. On a recent visit with her and her family, I had a chance to speak with her about her current situation. While I was again struck by how she remains much more child-like and shy than brave, I also could see she has made real progress in talking openly about her arrest and in recognizing what happened and accepting responsibility for what occurred. I will admit, however, I was unsure if she was able to cognitively process its full implications for her. Time may not change that.

Since she was little and into her adulthood, Sasha has always maintained a lovely, caring gentleness. I have seen it repeatedly with her friends and with pets. On one visit, she spoke caringly about her friend, Louis, who was going through a very difficult time after the death of his grandmother. I also saw it when she visited our home after we had adopted a puppy and when she herself had adopted a kitten. She took such great care of that little creature.

More recently, I enjoyed participating in a zoom celebration of her school graduation. It was heartwarming to hear family and friends speak to her kind nature, good character, and her perseverance in completing school requirements, which were not always easy for her.

Sasha is deeply loved by her family and her friends. I am saddened at what she is going through, but I am hopeful that the Court will able to see the kind, caring, responsible person Sasha is. I am also hopeful that the Court will recognize that her parents have the resources to ensure that Sasha will have the care that she currently receives, far into the future.

Please do not hesitate to reach out if you have questions or if I can be of further assistance. My email address is                              and mobile is 917.796.6904.

Sincerely,

Kathleen Christensen

Hon. Kari A. Dooley

United States District

Court for the District of Connecticut

12/12/2025

Dear Judge Dooley,

My name is Patrick Murphy and to Sasha May I am uncle Pat. I share a common bond with Sasha, Owen at the time when he was introduced to our family. We are both products of the adoption service where we don't pick our family, but they pick us. We were both given a fresh start even at such an early age. Both of us were blessed with loving parents who provided shelter, guidance and an education that would help us on our journey through life.

Watching Owen grow up I noticed physical and mental behavior that would have to be addressed (examples: walking and running on tip toes, speech that was difficult to understand). Was a compromised lifestyle during the pregnancy to blame? I don't know. Pam and Stephen have always been there for Owen/Sasha and obtained the help needed to try and correct these difficulties. As Owen grew older, he was facing an identity crisis. More help was given but Owen felt the need to become Sasha.

We all make mistakes in life, some worse than others and those more grievous become punishable. Sasha has made those mistakes and that's why we are here today. This is not a victimless act, and it is now up to the court to decide on Sasha's fate.

Since Sasha's house arrest and additional therapy, I've noticed a change in her. No longer does Sasha run up to her room after a family dinner but she stays engaged in conversation, brings talking points to the table and does not shy away from controversial topics. In my generation you be outside playing stickball, hanging out with friends until the dinner call was sounded. Today, society has created a computer-generated audience with social media and a woke culture poisoning the impressionable. I'm not saying all social media is bad, just that the Darkside of social media is too easily obtained, which leads to trouble.

I am asking the court to be merciful and show leniency to Sasha. She is truly remorseful. Restricting computer access and additional therapy have been a positive step. As a family member Sasha will have our support, and we will be there for her in good times and in bad.

I would like to thank the court for allowing me the opportunity to write this letter. In closing my prayers go out to the victim and his or her family for the pain encountered. I wish them well through the healing process and hope for a peaceful and productive life.

Sincerely,

Patrick Murphy

Hon. Kari A. Dooley
United States District Court for the District of Connecticut
915 Lafayette Blvd.
Bridgeport, CT 06604

Re: Sasha E.  May

Dear Judge Dooley,

I'm Sasha May's older sister, Mary. I am a lifelong educator, currently residing in New York City with my young family.

I first met Sasha just days after her birth, when she was lovingly adopted into our family home at 110 Highbrook Avenue in Pelham, New York. When Sasha was born, I was 16 years old. Sasha brought immeasurable joy to my parents and to my brothers and me even before her arrival; my mom, Pam Sloan, and stepfather, Stephen May, happily built their entire lives around their endless love for their adoring children, of whom Sasha is the fourth and last.

Sasha's struggles began in early childhood with speech and academic challenges in school. At the time, I was starting my own career as an elementary school teacher, and I observed and admired my parents' tireless efforts to ensure Sasha had the best teachers, best school settings, and best specialists to support her unique learning differences. Their decisions for and with Sasha have always been rooted in research, external expertise, and love for Sasha.

This same framework guides them today.

Sasha, now an adult, faces serious mental health issues that have impacted our family to its core. My parents, my brothers and I all understand, without question, that these are challenges that Sasha will face for the remainder of her life. Our family, including Sasha, is collectively committed to ensuring Sasha's safety and health, that she is an uplifting part of the fabric of her family and community, and that she continues on an upward trajectory.

Indeed, since the events of August 2024, my parents have ensured that our family band together to guarantee that the rule of law is enforced, that Sasha participates in research-based rehabilitative programs and services, and that our family unit remains strong and supportive of Sasha and of each other.

Judge Dooley, as you consider the best next steps for Sasha, please know that she has a united, highly capable and committed family behind her.

Best regards,

*Mary E. Young* (signature)

Mary Paranac

PAMELA M. SLOAN
110 Highbrook Avenue
Pelham, New York 10803

January 7, 2026

Hon. Kari A. Dooley
United States District Court for the District of Connecticut
915 Lafayette Blvd.
Bridgeport, CT 06604

Re: Sasha Elizabeth May

Dear Judge Dooley:

On July 24, 2001, at The Baptist Hospital in San Antonio, Texas, a newborn baby boy was entrusted to our family by both his birth mother, Betty, and, I believe to the core of my being, the Good Lord. On that day, I became "Mom" for the fourth time, but this time, in the most miraculous of ways. While I knew exactly how, when, and why Mary, Michael and Brendan came to us, Owen's arrival was a mystery. Somehow, from among the hundreds and hundreds of families desperate to have a child in their lives, ours was chosen for this new person, with his singular heart, mind, and soul. His delivery to our family was simply a miracle, one for which on that day, and on every day that has passed in the nearly twenty-five years since, *without exception,* I have been grateful.

Twenty-four years later to the day, that child, by then my daughter, Sasha, stood upright and respectfully before Your Honor, and voluntarily, but ashamedly, acknowledged that she had committed a serious crime – one with life-altering consequences for the children depicted in the images, for their families, for every member of our family, including Mary's young children, and of course, for herself.

The twenty-four years between those two events were complicated and challenging, to say the least. I am aware that family members, friends and neighbors have written to Your Honor describing Owen's journey from extraordinarily beautiful and adorable baby, to joyful, mischievous toddler, to socially awkward, marginalized, elementary school student, to struggling, lonely middle school student, to isolated and bullied high school student, to Sasha, the disengaged, friendless trans-female junior college student, and finally, to the depressed, adrift, lonely young adult who, try as she might, could not secure employment or friendships – two things she desperately wanted. Those witnesses to Sasha's struggles over the course of her life also saw a kind and gentle person, who was never cruel to any living thing. Sasha's

1

therapeutic and educational history, chronicled both in the expert reports and her clinician's reports, describe all the support – emotional, therapeutic, social, educational – we have tried our best to provide. Because those friends, loved ones and experts have seen Sasha through a clearer, more reliable prism than a Mom's could possibly be, I will rely on their reports of Sasha's struggles, kindness and gentle soul, and turn instead to something not yet addressed – Sasha's future.

My husband and I, along with Mary, Michael, and Brendan, are committed as a family to ensuring that every possible opportunity will be given to Sasha to overcome the challenges and distorted judgment that led her not only to open the door to the dark web, but to walk through that door and engage with individuals who inhabited it. My husband retired early from a profession he loves to be at home and present with Sasha, assisting her in any way she needs during the daytime hours. We are routinely at home with her in the evening and overnight. We will continue to ensure that Sasha has available to her and participates in the concentrated, specialized therapies in which she has been engaged since shortly after her arrest, supplemented by continued speech and academic therapies designed to improve her communication skills and increase the well of information she can draw on to have genuine conversations with people. I assure Your Honor that these therapies have already tapped into the Sasha we always suspected was buried inside her body: a friendly, more social person who now sits at the dinner table with us and engages in discussions; a person who now comes downstairs when neighbors come to visit; a person who now asks her father and me if we want to join her in a board game or to watch a movie; a person who now talks about her feelings, about wanting friends and about getting a job "when I've made up for what I did;" a person who, without being asked, voluntarily does chores around the house and in the yard; a person who participates in the planning and preparation of enjoyable (and sometimes delicious) family meals.

On Thanksgiving Day, we, like many families, went around the table with each guest saying what he/she was most grateful for this year. When it was Sasha's turn, without skipping a beat, she said: "I'm grateful my family loves me and supports me, even though I did such a bad thing. I'm so sorry for what I did to everyone. I hope you can forgive me. I love you. Thank you."

Certainly, we are not the only people whom Sasha should ask for forgiveness. Sasha knows that the children depicted in the images are victims, and that every time the images are viewed, they are victimized again. But as we understand it, Sasha cannot directly ask those children or their families for forgiveness. We, however, have talked with her about how she can and must ask the victims for forgiveness in a spiritual way, and that she must do so forever. She has acknowledged the importance of doing that.

We are convinced that the work Sasha is doing – work that should continue, perhaps forever – has enlightened Sasha in many ways. She now shows empathy for others. She now shows interest in other people and what makes them happy. She now expresses understanding of

2

right and wrong. In short, she is venturing out of herself and her dark, lonely, private life and sharing herself with us.

We believe this is the start of only good things to come. We know that, in addition to our love and support, Sasha requires serious professional emotional therapies, and we are committed to providing them until the day she leaves this world. We will never let down our guard or assume that "this is all behind her," but we also will not let Sasha be defined by her actions during her darkest hour. We will ensure that Sasha will never be a danger to any person; we will stand by her, and support her, as she confronts and defeats her demons. And while we will always be on watch for problems, we will also be with her to celebrate the friends, the joy, the love (and the job) she so desperately wants and, we believe, she can find.

In closing, lest the Court think these are hollow promises, together, my husband, our three other children and I have discussed Sasha's long-term emotional and financial support. With the full support of Sasha's siblings, my husband and I are putting in place an estate plan that includes a Special Needs Trust, into which just about the entirety of our estate will go so that after we are gone, Sasha's needs will still be met. Sasha's brother, Michael Paranac, will be the Trustee.

Over the years, many people have commented that "Sasha is so lucky you adopted her." Each time, we responded, "you've got it wrong; it is we who are the lucky ones. Our family was not complete until she arrived." Nothing has happened to change that belief. Owen Patrick May was a miracle the day he was delivered to us almost twenty-five years ago. Despite the awful pain she, as Sasha, has caused to the children and families whose names we will never know -- pain for which we are truly and deeply sorry -- and despite the pain she has caused to our own family, I will be forever grateful that I am her Mom.

I am fully aware of Your Honor's obligation to consider the victims and the public as you impose a sentence on Sasha for her wrongdoing. I thank Your Honor from the bottom of my heart for reading and considering all the reports and letters submitted in support of our daughter as you weigh your obligations, deliberate and set the course for Sasha's future.

Respectfully,

*Pamela M. Sloan* (signature)

Pamela M. Sloan

3

January 5th, 2025

To Whom It May Concern:

    I first met Owen May when he was in middle school. At that time, he was a vulnerable and self-conscious adolescent facing profound and complex challenges that significantly affected every area of his development. These included severe childhood apraxia of speech; receptive and expressive language disorders; multiple learning disabilities, including dysgraphia and significant reading and writing impairments; and substantial executive functioning deficits involving attention, processing, and organization. Academically, he was functioning at least five years below grade level in both reading and writing.

    From a clinical standpoint, Owen presented with extremely low muscle tone and one of the most persistent and treatment-resistant articulation disorders I have encountered in my professional practice. Despite years of intervention within the public school system, he made minimal functional or academic progress, and meaningful remediation was not achieved. His parents consistently reported concerns regarding social isolation, difficulty forming friendships, and a growing sense of discouragement and withdrawal.

    During our earliest sessions, Owen expressed that he "did not work for tutors." This statement reflected not defiance, but rather years of unsuccessful remediation attempts and repeated experiences of failure within educational settings that had not been equipped to meet his needs.

    I have worked with Owen continuously since that time. Through intensive, individualized intervention, he ultimately achieved grade-level reading and comprehension—an accomplishment that reflects significant effort and persistence in the face of longstanding barriers. However, his verbal apraxia and dysgraphia remained highly resistant and required ongoing treatment to maintain skills and support generalization beyond therapy. While he continued to make gains in language comprehension and expression, and academic capacity during treatment sessions. Systemic educational supports remained insufficient. As a result, he remained socially isolated, with limited opportunities for meaningful peer connection.

    In the later years of high school, Owen—now known as Sasha—began to show meaningful shifts in engagement and self-expression. She gradually became willing to participate in vocal exercises that supported modulation, intonation, and expressive language. A turning point occurred when she connected with a graphic novel that allowed her a sense of safety and interest sufficient to explore her vocal range and emotional expression for the first time. Her previously flat and non-expressive speech began to show measurable improvement within treatment sessions. As with many of her skills, generalization beyond therapy required continued support, but the progress marked an important developmental milestone.

Sasha remained in treatment through high school and went on to pursue post-secondary education remotely through Monroe College. During this time, she explored multiple academic paths, transitioning from culinary studies to information technology and ultimately completing an associate degree in hospitality. She required ongoing support for comprehension, organization, and execution of coursework, including weekly assignments and long-term projects. Importantly, she demonstrated notable strengths in research, problem-solving, and task completion when provided with appropriate structure. Her college enrollment was driven in part by her parents' advocacy and belief in her potential, particularly at a time when employment opportunities were inaccessible to her.

Despite consistent family support and extensive intervention, Sasha continued to experience significant social and emotional challenges. Chronic isolation, limited independence, and delayed social development contributed to clinically significant anxiety and depression. These struggles must be understood within the context of a young person who had spent years navigating systems that repeatedly fell short of addressing her needs.

Over the past year and 3 months, I have observed a profound and sustained transformation in Sasha's motivation, engagement, and sense of personal agency. She has shifted from passive participation to active investment in her own growth and future. She now demonstrates genuine curiosity, initiative, and pride in her accomplishments. Most notably, she has learned to write in both print and cursive over the past year—skills she now uses as a functional means of communication since technology is unavailable. This represents a breakthrough, particularly given that prior attempts to teach these skills years earlier were unsuccessful due to emotional and motivational barriers rather than ability.

Sasha now approaches learning with perseverance, even when faced with difficulty. She is actively engaging in structured self-assessment, exploration of strengths, and identification of interests and aptitudes through systematic tools and guided support. For the first time, she is developing a realistic and hopeful understanding of how her abilities may align with future vocational paths that include both earth and social sciences, for example, Geology, Conservation, and Archeology.

Sasha's family has been instrumental in reinforcing therapeutic goals, maintaining structure, and supporting her compliance with treatment. Their guidance, supervision, and emotional support provide critical protective factors and create a stable home environment that reinforces her ongoing rehabilitation.

I am fully convinced that Sasha is on a positive and sustainable trajectory toward emotional stability, psychological well-being, and functional independence. Over the past year, she has demonstrated meaningful insight, accountability, and a sincere commitment to personal growth. While her offense was serious, her recent behavior reflects rehabilitation rather than risk. With strong family support and an engaged therapeutic team, she has shown a consistent willingness to participate in treatment and self-improvement.

      Based on my longstanding clinical relationship with Sasha, I believe she has significant potential to become a law-abiding, contributing member of society. Her progress reflects both her own effort and the effectiveness of continued support, structure, and opportunity. Removing her from these stabilizing influences would risk undermining the gains she has made. Continued community-based treatment, combined with family support, offers the best path for lasting rehabilitation, public safety, and successful reintegration. I am confident that, with this multidisciplinary team in place, Sasha will continue to mature, grow, and make positive contributions to her community.

Thank you,

Karolyn Prisciandaro, MA, CCC-SLP

TO: Judge Kari Dooley
FROM: Lawrence Weschler  (neighbor)
RE: The case of Sasha May
December 29, 2025

I am writing you as a longtime neighbor of the Sloan-May family (of over thirty years!) to give you some idea of how people in the neighborhood feel about this tragic and complicated case.  For starters, to let you know that the Sloan-May family (anchored by the distinguished lawyer mother Pam and the vivid high school science teacher father Steve) are themselves the veritable anchors of this end of the neighborhood, well treasured and beloved for their general leadership and the dear example of their thriving family.  Sasha (then known as Owen) was the capstone addition to that family, coming on 25 years ago, and the forthright courage with which Pam and Steve took on this addition, knowing that he might likely suffer from post-natal alcohol and drug syndromes, only increased our regard for all of them.

Owen was an adorable toddler and youngster, generally sweet natured though (as I would hear from my daughter Sara who used to babysit him) given to occasional despairing tantrums when confused or overwhelmed—he would subsequently be diagnosed as severely dyslexic and "dys-everything" (as his father would say) and must in retrospect have been well along the autism spectrum (though that specific diagnosis only got assigned more recently).  He grew into a strange awkward loner of a kid, but always a gentle one (to this day no one in the neighborhood sees him, now her, as a threat in any way, *I cannot emphasize this enough*). We were all impressed by the great lengths to which the family gathered around him by way of special schools and supplementary programs. Presently the gender dysphoria issues began to make themselves felt (though again, *in no sense in any threatening way*) and the family and the neighborhood seemed to take those in stride as well. Owen was now just Sasha.

But the main thing about Sasha was her extreme shyness, and in retrospect her clearly aching loneliness.  She began spending most of her time in her attic room, extraordinarily creatively it should be noted, fashioning ever more impressive Lego dioramas.

I am convinced—and here I think I can speak for the neighborhood as well—that the catastrophic events that were to ensue had their origins in that awkward aching loneliness and the yearning to be accepted in a peer community I would guess that she was going along with the group out of a deep-seated desire and need just to be part of any group.  I cannot imagine that Sasha ever would have taken part in any sort of abusive physical behavior toward any person, let alone a child.

In this context we have been quite impressed with the way the family itself has addressed the aftermath of the charges, in no way denying the seriousness of Sasha's offense or the evident need for therapeutic interventions of all sorts. The other kids in the family came together in support of Sasha and of their parents, as did the neighborhood. The family's grace under extreme pressure has been exemplary. Steve, the father, took early retirement (a serious loss to the New Rochelle High School community) in order to be there for Sasha. He and Pam have scrupulously sought out specialists who have in the meantime been helping Sasha to work through her whole complex of issues. Sasha's brothers have likewise regularly returned home when needed. And Sasha has been seeming to blossom accordingly, is more forthcoming and less self-isolated when one goes over to visit the household.

In short, it seems to me, again as a member of the wider community, that what we see here is a troubled and still quite young person who, with the help of her family, is doing her best to work through her profound issues and set herself on a promising path. From everything we have been seeing, it is slow work, but it is succeeding. Sending her to prison, by contrast, would be shattering. (All the more so in the current environment where the Trump administration is insisting on prisoners being remanded to institutions based on their birth-genders: *I literally cannot conceive of the horrors in store for Sasha were she forced to serve time in a men's prison*, and it seems to me that such a dire prospect should enter your calculations as well.) This strikes us as the very epitome of a case calling out for judicial discretion—and again I really feel like I am speaking for the whole neighborhood.

With the highest respect for your office, service, and the challenges you yourself will be facing at this stage of Sasha's prosecution, I ask that, when making this life-altering decision for Sasha (and her family), you show mercy and place your trust in Sasha to remain committed to addressing her complex problems in a productive way, and in her family to ensure that she continues to get all of the therapeutic help she needs for as long as it takes. And in her neighborhood to be there for her as well.

Respectfully,

Lawrence Weschler

103 Highbrook Ave
Pelham, NY, 10803
917-699-1775
www.lawrenceweschler.com

Hon. Kari A. Dooley

United States District Judge

District of Connecticut

Re: Sasha E. May

Dear Judge Dooley,

I retired as a detective from the New York Police Department in 2009 after 35 years and moved from New York to Maryland. My wife and I live near our son, daughter-in-law and their six children. I'm also a retired Navy Reserve intelligence officer and am currently employed by the Department of Defense, assigned to the National Joint Terrorism Task Force.

In the spring of 2016 my sister, Pam, called me with an urgent problem. She told me that she and her husband, Stephen, were driving home to Pelham with Owen, now Sasha, from the Forman School in Litchfield for a long weekend. The Forman School specializes in helping young people with Attention Deficit/Hyperactivity Disorder and similar issues. Owen was a boarding student there. He was very unhappy at Forman, though, as he had had no friends, was very lonely and was being bullied.

Pam told me that Owen was sitting behind her in the car, and that Owen sent her a text message even though Pam was sitting directly in front of him. The text read " Mom – if I go out and don't come back its because I found out bad guys are bringing a teenage girl from California to New York to sell and she needs help." Pam asked if he knew the girl and he said that he didn't. Pam continued to question Owen, who told her that he had been on a website called Omegle, a place where lonely people can meet friends and chat. Owen was contacted on the site by someone who claimed to have a young girl that he was bringing to New York to sell. Pam told Owen that this could not be real but Owen was very upset and was convinced that he had to save the girl. He wanted to arrange a meeting with the person who had contacted him and became desperately angry with Pam for suggesting that the claim was a setup. Pam insisted that they call me. Owen agreed and I spoke with Pam and then with Owen.

Despite my many years as a detective I had no direct experience with things like this but Pam and I wanted to be sure that in this case there was not a girl in danger. I called a detective in the New York Police Department who investigated such matters and passed him the details that Owen had given me. Two days later the detective called me back and told me that this particular case was, indeed, a scam.

This incident shows a great deal about Sasha. The awkwardness of how she communicated with Pam in the car, the loneliness and vulnerability, the naivety and yet the genuine care and strong determination to do the right thing were all there.

I remember an event in the late fall of 2001 when I returned from Navy duty in Washington to attend the memorial Mass for a close family friend who was killed on 9-11. Owen was an infant then, and at the reception after Mass everyone wanted to hold Owen, a beautiful little baby and a sign of hope. As Sasha grew, though, I saw her struggles to connect with people. There was always a smile, but it was often melancholy even as a youngster. There was the awkwardness and the constant attempts to connect without ever quite connecting, even though her loving nature is apparent. We don't think that what Sasha did defines her. We love her and have hope.

Sincerely,

*Edward Sloan*

Edward Sloan
1806 Belvedere Boulevard
Silver Spring, Maryland 20902