UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:25-CR-114 (KAD) |
| | : | |
| v. | : | |
| | : | |
| SASHA MAY | : | February 2, 2026 |

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in aid of sentencing of the defendant, Sasha May ("May"), presently scheduled for February 9, 2026, at 2:00 p.m. In her plea agreement, May agreed not to seek a sentence of less than 24 months of imprisonment. *See* Doc. No. 52 at 6 (plea agreement). For the reasons set forth below, the Government respectfully requests that the Court impose a just and appropriate term of imprisonment of no less than 24 months, followed by a lengthy period of supervised release.

## I.    BACKGROUND

### A.  Procedural history

On August 26, 2024, May was arrested on a criminal complaint, charging her with distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(B). Doc. No. 1. On July 24, 2025, May waived her right to an indictment and pleaded guilty to a one count Information charging her with possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2). *See* Doc. Nos. 48-49. As part of the plea agreement, May agreed not to seek a sentence of less than 24 months of imprisonment, and the Government agreed not to pursue a charge of distribution of child pornography, which would have carried a five-year mandatory minimum sentence. *See* Doc. 52 at 6.

### B.  Underlying facts

A detailed recounting of the facts appears in paragraphs 6-20 of the Presentence Report ("PSR") (Doc. No. 80). Below is a summary of the facts.

On December 30, 2023, May responded to a public post on the social media messaging application Whisper.[1] The post, which was posted by an undercover FBI Task Force Officer ("TFO") (the "UCO"), referenced a "dad that is broke because his stepdaughter is so expensive." PSR ¶ 7. In that conversation, which is captured in more detail in paragraph 7 of the PSR, May inquired about the UCO's fictitious stepdaughter and after being told that she (the stepdaughter) was 14 years old, immediately asked "could I see her possibly?" *Id.* Shortly thereafter, May sent the UCO a photo of her exposed breasts. *Id*. In response, the UCO asked May, "[w]hat are you into? I mean what are you into? Males, females, teens.." to which May responded, "[t]eens I guess." *Id.* Later in the conversation, May stated, "[y]ee Also I understand that I'm a bad fit for a babysitter." After the UCO asked why, May responded, "[c]ause I'm into kids." *Id*. Shortly thereafter, the UCO sent May two non-explicit photos of his fictitious stepdaughter. As the conversation shifted to a discussion about the UCO's stepdaughter, the following exchange took place:

- UCO*:* If you babysat…how would you find out if she was into girls?
- MAY: I mean id prob dress provocative and then maybe lay my hand on her thigh maybe say some suggestive things.
- UCO: And what if she told you she liked you.
- MAY: Then id have to make sure I gave her a good bye kiss or a see you later kiss.

---

[1] Whisper is a free mobile application available on Android devices. It is a form of social media that allows users to post and share photos, videos, and messages anonymously.

- UCO: Would you do anything else besides put your hand on her thigh and say suggestive things…if she was into it?
- MAY: If she was super into it I could bring my strap for her to feel. Tho if you wanted I could bring some toys with me. I got poppers too if you want me to give them to her.
- UCO: I'm Don btw
- MAY: I'm sash
- UCO: Cool..you ever fuck a teen
- MAY: sadly no
- UCO: U wanna
- MAY: Ya. I'm 100 % willing to do the babysitting gig if you want.
- UCO: Great! I will def reach out and let ya know.
- MAY: Got it

PSR ¶ 9.

Just after midnight on January 1, 2024, May messaged the UCO telling him that she spent New Years "smoking weed, playing video games, and [thinking] about kids." May ended the conversation stating, "[a]lso, if you had more pics of your kid I'd love to see them." In response, the UCO sent another non-explicit photo of his fictitious stepdaughter, and the conversation continued with May responding "[May would] love to sloppily make out with her. I bet she makes the cutest noises." In that same conversation, May sent the UCO a photo of her with her boyfriend. PSR ¶ 10.

The next day, the UCO continued the conversation with May wherein she stated, "currently studying to get a teachers assistant certification. I wanna work in a kindergarten so I can work with kids. I wanna give kids the joy that I had from a teacher who shared that they cared for me the pervy bit is a lil extra. I wanna spread joy and confidence. And sometimes pain but that's not for the kids lol." PSR ¶ 11. After this conversation, May ceased contact with the UCO for several

3

weeks. During a subsequent conversation with the UCO, May and the UCO engaged in the following discussion referring to the UCO's fictitious stepdaughter:

- UCO: I mean..what did you have in mind when you play with her? I thought that's what you wanna do.
- May: Oh well that depends on if she is asleep or not.
- UCO: lol. Well she did mention she likes girls.
- May: I'm glad. I'd love to give her a good time. I got a strap on as well so I could use that on her. I'm also getting a strapless one.

PSR ¶ 12. On January 30, 2024, the UCO inquired, "got anything in your collection to show me?" In response, May sent the UCO two photos of child pornography. One photo depicted a toddler naked from the waist down wearing a gray top and socks. PSR ¶ 13. The toddler is touching her vagina with her right hand and exhibiting her genitals in a lewd and lascivious manner. The second photo depicted a second toddler naked from the waist down displaying her genitals in a lewd and lascivious manner with her left hand touching her mouth. In response to these photos, the UCO sent another picture of his fictitious stepdaughter. *Id.* The conversation then continued as follows:

- May: God she is hot. How willing do you think she is trying kinks.
- UCO: She has been very open in the past. One friend of mine brought a vibrator he used on her. She loved it.
- May: oh my that sounds fun. Wish I could have seen her pussy.

On February 27, 2024, the UCO messaged May, who unprompted, sent the UCO a 55 second video that depicted child pornography. PSR ¶ 14. The video depicted a prepubescent blonde female standing on top of a bed. *Id.* The child pulls her pajama bottoms off and exposes her genitals in a lewd and lascivious manner. *Id.* The next day, on February 28, 2024, May told the UCO that she was close to getting her teacher's assistant certification but confirmed she was not working at

a school at that point. Several months later, on May 10, 2024, the UCO re-engaged in the conversation with May. The conversation proceeded as follows:

- May: Hi sorry haven't been on in a while I was focused on studies. I'm glad sorry I haven't babysat your daughter yet I've been looking forward to it.

- UCO: Do any babysitting lately

- May: No just teacher stuff I should be able to get a teaching job by this fall tho. Yee then I'll work with many kids.

- UCO: So much access to them too!!!

- May: True especially cause my town has those early development programs which means I'll have more access.

- The UCO then asked May what her plan was.

- May: Prob will start small, if I get to change any lil just slide a finger for taste lol. Maybe I'll clean them with my moth for parts of it.

- UCO:  naughty teacher.

- May: Maybe I am but Ill be fun. I mean what kid is gonna say no to an early gasm unless they don't concent of course. I mean I love kids but I never wanna hurt one.

- UCO:  Oh never…just keep them happy.

- May: Yea. I love smiles on people's faces especially the people I'm intimate with unless they ask for something.

- May: I still wish I had a dick but I don't wanna scare any little boys with a bigger one then theirs.

- UCO: So when are you free to babysit?

- May: The weekend should be good.

PSR ¶ 17. During a later conversation between May and the UCO, the UCO asked May if she knew any of the children that were depicted in the child pornography she distributed to the UCO. May told the UCO that the photos were from a website on the dark web called "Naughty Kids."

May explained to the UCO that he needed to use a Tor Browser[2] to access the website. During that conversation, after walking the UCO through how to download and "unzip" the files on Naughty Kids, May also told the UCO that he would need to get a USB drive to store the photos and videos. PSR ¶ 18. When asked if she stored her collection on a USB drive as she instructed the UCO, May responded, "nah, I play dangerously…I never know if I am gonna get horny so I keep it on my phone for use." *Id.*

May was arrested at her home in Pelham, NY, on August 26, 2024. Upon her arrest, May was handcuffed and an FBI agent and a TFO drove her to Connecticut for her initial appearance. During the drive, May expressed several suicidal ideations. While on the highway, May became extremely agitated and began kicking the TFO who was driving the vehicle.  May struck the TFO approximately five times, hitting him in his neck, head, and shoulder.  May's actions placed all the occupants of the car in danger, and her kicking caused the TFO to swerve the vehicle across two lanes of traffic on the Merritt Parkway in Norwalk, CT. *See* Gov't Ex. 1. Eventually, the TFO was able to safely pull over on the side of the highway. At that point, May expressed additional suicidal ideations and expressed her indifference to her own life and the lives of the agents. PSR ¶ 19.

## II.    STATUTORY AND GUIDELINES EXPOSURE

### A.  Statutory Exposure

Based on her plea of guilty to violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2), May faces a maximum term of imprisonment of twenty years. May also faces a term of supervised release of five years to life, as well as a maximum fine of $250,000, a mandatory $100 special

---

[2] A Tor browser is a commonly used way to gain access to the dark web.

assessment, and an additional assessment of $5,000 pursuant to 18 U.S.C. § 3014. Doc. No. 52 at 2.[3]

### B. Guidelines for the Instant Offenses

The parties agreed, pursuant to the Plea Agreement dated July 24, 2025, that the Court is required to consider the applicable Sentencing Guidelines as well as the factors enumerated in 18 U.S.C. § 3553(a), which may result in a sentence that departs from the calculated Guidelines set forth in the plea agreement. Doc. No. 52 at 4.

The parties further agreed, pursuant to the Plea Agreement, on the following Guidelines stipulation: May's base offense level under U.S.S.G. §2G2.2(a)(1) is 18. Two levels are added under §2G2.2(b)(2) because the material involved a prepubescent minor who had not attained the age of 12 years. *Id.* at 6. Two additional levels are added pursuant to §2G2.2(b)(3)(F) because the defendant knowingly engaged in distribution. *Id.* Four levels are added under §2G2.2(b)(4)(B) because the offense involved material that portrays sexual abuse or exploitation of an infant or toddler. *Id.* Two levels are added under §2G2.2(b)(6) because the offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material. *Id.* Two additional levels are added because the defendant possessed at least 10 images but less than 150 images, resulting in an adjusted offense level of 30. *Id.* Additionally, the stipulation of offense conduct attached to the Plea Agreement establishes the additional offense of assaulting an officer while

---

[3] At the time of her plea, May was subject to an additional assessment of $5,000 for the Justice for Victims of Trafficking Act ("JVTA"). That provision sunset on September 30, 2025. On November 12, 2025, the JVTA was re-authorized under the Continuing Appropriations Bill. *See* H.R. 5371. However, the re-authorization expressly prohibits the retroactive application of the JVTA.  *See* H.R. 5371, Section 125, Division A ("this section shall take effect on the date of enactment of this Act and shall not apply retroactively."). Accordingly, the Government's view is that the JVTA does not apply to any criminal conduct that occurred before November 12, 2025.

engaged in their official duties. Therefore, for purposes of the Guidelines, May is to be treated as if she were convicted of that offense, which results in a base offense level of 14. Under U.S.S.G. §3D1.4(c), no units are added to the adjusted offense level. *Id.* Finally, three levels are subtracted under §3E1.1 for acceptance of responsibility, resulting in a total offense level of 27.

Pursuant to the Plea Agreement, the parties also agreed that the defendant falls within Criminal History Category ("CHC") I and does not qualify for a two-level reduction for zero-point offenders because her offense of conviction is a sex crime. *See* U.S.S.G. §4C1.1. A total offense level of 27 assuming CHC I results in a Guidelines range of 70-87 months of imprisonment. Doc. No. 52 at 6.

In the Plea Agreement, the defendant agreed to not seek a term of imprisonment of less than 24 months, and the Government agreed not to pursue an indictment for distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2). *Id.* During plea negotiations, the Government and the defendant entered into an evidence review agreement, in which the defendant allowed the Government to search her phone which law enforcement seized on the day of her arrest but did not have a warrant to review. As part of this agreement, among other things, the parties agreed that the Government could use evidence found on the phone in connection with the defendant's sentencing, in which event, the Government will ask the Court not to consider such information in determining the defendant's sentencing Guidelines range but the information could be used as a part of the Court's consideration of the factors under 18 U.S.C. § 3553. Because of this evidence review agreement and the additional child pornography found on May's phone pursuant to the evidence review agreement and  highlighted in the 2nd Addendum to the PSR (Doc. No. 82), Probation calculated a different Guidelines range, concluding that May's base offense level is 29, which results in a Guidelines range of 87 to 108 months of imprisonment. *Id.* at 3.

### III.    DISCUSSION

The Government respectfully submits that a sentence of imprisonment of no less than 24 months appropriately captures the severity of May's conduct in this case while also taking into account her history and significant mental health challenges. May's actions perpetuated the cycle of harm that victims of child pornography offenses endure through the production and subsequent transmission of their images on the internet. The issue before the Court is to determine an appropriate sentence for May when applying the relevant factors under 18 U.S.C. § 3553(a).

As the Court is aware, after the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220, 243-45 (2005) rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the calculated Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *See United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006), cert. denied, 549 U.S. 882 (2006); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). The § 3553(a) factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the guidelines; (5) policy statements issues by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a).

In this case, the most significant factors include the nature and circumstances of the offense, the seriousness of the offense, May's history and characteristics, the need for deterrence, and protection of the public. The Government will address each of these factors in turn.

**A. Nature, circumstances, and seriousness of the offenses**

The nature and circumstances of May's offense are undoubtedly serious. The crime of possessing child pornography is an extremely serious offense that preys upon the most vulnerable of victims.

As this Court is surely aware, child pornography victims are harmed initially during the production of images and suffer additional significant harm from the perpetual nature of child pornography, that is, awareness that the images depicting the worst moments of the victims' lives are being used for pleasure and sexual gratification. The courts have highlighted the very serious nature of these offenses. *Paroline v. United States*, 572 U.S. 434, 440 (2014) (quoting *New York v. Ferber,* 458 U.S. 747, 759 (1982)) (long after the physical abuse has ended, the images produced continue as "'a permanent record' of the depicted child's abuse, and 'the harm to the child is exacerbated by [its] circulation.').

> It is common ground that the victim suffers continuing and grievous harm as a result of her knowledge that a large, indeterminate number of individuals have viewed and will in the future view images of the sexual abuse she endured. . .. The unlawful conduct of everyone who reproduces, distributes, or possesses the images of the victim's abuse . . . plays a part in sustaining and aggravating this tragedy.

*Paroline*, 572 U.S. at 457 (citations omitted); *United States v. Sherman*, 268 F.3d 539, 547-48 (7th Cir. 2001) ("Although society at large is also a victim of these crimes, the primary, identifiable victim is the child portrayed, who must live with the knowledge that adults . . . can pull out a picture or watch a video that has recorded the abuse of that child at any time."). The harms caused

by this cycle of revictimization are devastating. Child sexual abuse material victims are "subject to a greater long-term risk of depression, guilt, poor self-esteem, feelings of inferiority, interpersonal problems, delinquency, substance abuse, suicidal thoughts, and post-traumatic stress disorder than other child sexual assault victims." Patti B. Saris et al., U.S. Sent'g Comm'n, *Federal Child Pornography Offenses* 113 (2012).[4]

Despite the unquestionably serious nature of May's possession and distribution of child pornography, perhaps the most concerning aspect of May's conduct is the substance of her conversations with the UCO indicating that she wanted to have access to children. More specifically, May expressed her interest in "babysitting" the UCO's "daughter" as well as her intent to become a teacher.  In her conversations with the UCO, May detailed her desire to acquire her teacher's assistant certification so she can work with "kids." In her words, "[she] wants to work in a kindergarten so she can work with kids. [She] wan[ts] to give kids the joy that [she] had from a teacher who shared that they cared for [her] the pervy bit is a lil extra." PSR ¶ 11. Although she did not initially elaborate further with the UCO, her later explanation is extremely troubling. In her conversation with the UCO in May 2024, May explained that she was hoping to earn her teacher's assistant certification in the fall. After the UCO told her that she would have "so much access to them," referencing kids, May responded, "[t]rue, especially cause my town has those early development programs which means I'll have more access." PSR ¶17. In response to the UCO asking what her "plan" was, May stated, "[p]rob will start small, if I get to change any ill just slide a finger for taste lol. Maybe I'll clean them with my moth for parts of it." *Id.* While the defense may argue that May's statements to the UCO were simply hyperbole, it is clear that May was pursuing a career that would have her around children of the

---

[4]  Available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf

same approximate age as the child pornography images she possessed. In other words, she had put into action a plan to gain access to children.  May's efforts to acquire a professional license cannot be disclaimed as hyperbolic or farfetched. To the contrary, it underscores the seriousness of May's conduct, and her danger to the community.

**B.  History and Characteristics of the defendant**

The Court should also consider and weigh May's history and characteristics. The Government appreciates that May has faced significant challenges in her life related to her numerous mental health diagnoses, including autism. While those conditions certainly evoke a measure of sympathy and should be considered as mitigating by the Court, they do not wholly excuse May's behavior. Nor should they be reasons why the Court should consider a non-incarceratory sentence.

First, despite May's argument to the contrary, the BOP is well equipped to house transgender prisoners. While May argues that the fact that she is transgender should be a reason for a lenient sentence, she is certainly not the first transgender individual to be placed in BOP custody. The BOP is well equipped to address May's physical health concerns as a transgender inmate. To put it bluntly, her status as a transgender inmate is not a valid reason for her to receive a more lenient sentence.

May also argues for a downward departure or variance based on her significant mental health issues. While May's mental health diagnoses should certainly be considered by the Court in determining an appropriate sentence, they do not explain or excuse her of responsibility for her serious conduct. She argues, "[her rehabilitation to date] is fragile, the product of a stable, interdisciplinary, intensive, and specialized outpatient structure that cannot be replicated in custody." Def Sent. Mem. at 17.

While the Government commends May's work towards rehabilitation since her conduct came to light, May is not the first and will certainly not be the last BOP inmate that requires intensive and specialized treatment for a panoply of mental health issues. In that vein, her argument ignores the fact that the BOP has numerous programs in place to treat inmates with various mental illnesses as highlighted in a BOP Program Statement from May 2014. Gov't Ex. 2. In part, that statement reads, "[t]he primary purpose of this Program Statement is to ensure that inmates with mental illness are identified and received treatment to assist their progress toward recovery, while reducing or eliminating the frequency and severity of symptoms and associated negative outcomes of mental illness…" *Id.* at 3. The BOP's statement attached as Government Exhibit 2 provides an in-depth overview of the varying levels of care that the BOP will be able to provide May, ranging from routine outpatient mental health care to inpatient psychiatric care. *Id*. at 8.

Setting aside the wide array of options for mental health treatment, the BOP also provides specific treatment program options for sex offenders, which serve the purpose of providing services to minimize the recidivism rate for sexual offenders. *See* Gov't Ex. 3; *See also*, PSR ¶ 113 ("Ms. May could benefit from the Residential Sex Offender Treatment Program. This program is a high intensity program designed for high-risk sexual offenders. The program consists of cognitive-behaviorally based psychotherapy groups, totaling 10 to 12 hours per week."). In short, despite May's claims to the contrary, the BOP is well equipped to provide May the treatment she needs to continue the progress she has made while on pretrial release. While the programs may not be the ones that May prefers or with the providers that she is accustomed to, it is not the case that she will be left to fend for herself without access to treatment. Her argument to the contrary conflicts with the BOP's Program Statements and should not serve as a shield to support her argument for a more lenient sentence, or one that involves no period of incarceration.

May also argues that she deserves leniency because of her diagnosis of autism.  In her sentencing memorandum, May argues that her autism led to her retreating into dangerous online environments, leading to her "immersion in unhealthy online spaces" which she attempts to disavow by explaining that her online behavior "is best understood as a maladaptive response to disability driven social impairment and chronic victimization, not as evidence of predatory intent or future dangerousness…" Def. Sent. Mem. at 21. While it may be true that May's autism caused her to shun human social interactions for the seclusion of online chatrooms and messaging applications, her argument fails to address the causal link, or lack thereof, between autism and her predilection for children and child pornography.  The notion that May was not fully aware of the wrongful and predatory nature of her behavior due to her autism is undercut by some of the discussions between May and the UCO. For example, May's admission that she kept child pornography on her phone because she "play[s] dangerously" is illustrative of her knowledge of the wrongfulness and danger of her conduct. Additionally, May's statements to Dr. Imhoff and Dr. Spence in their report (Def. Ex. 1) (the "STAR Report"), also touch on that point. In their report, Dr. Imhoff and Dr. Spence write, "She indicated other users began requesting to trade material which is how she began accessing CSEM. She described this material as initially 'exciting and thrilling' due to the taboo nature; however, this effect quickly dissipated." Def. Ex. 1 at 5. It's clear from that statement in the STAR Report that May was acutely aware of the wrongfulness and "taboo nature" of the behavior she was engaging in, again undercutting her attempt to minimize her culpability.

While her autism may result in her social impairment and her inability to interpret social cues, it does not excuse her behavior in this case, and it does not explain why she has an interest in child pornography. What does explain that interest, is her diagnosis of pedophilia, which should

14

be viewed as aggravating, not mitigating. According to the STAR Report prepared in support of her sentencing, May "qualifies for a diagnosis of Pedophilic Disorder, nonexclusive type, attracted to females." Def. Ex. 1 at 22.  Despite Dr. Imhoff and Dr. Spence's discounting of May's risk of recidivism, particularly salient here is Judge Posner's opinion, that "[s]tatistical analysis of sex crimes has shown that the best predictor of recidivism is not deportment at an interview, but sexual interest in children." *United States v. Garthus*, 652 F.3d 715, 720 (7th Cir. 2011). In their fulsome explanation of this diagnosis, Dr. Imhoff and Dr. Spence write:

> To meet the criteria for this diagnosis, the individual must experience recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child (generally age 13 years or younger) for a duration of six months (Criterion A); the individual has acted on these sexual urges or the sexual urges or fantasies have caused marked distress or interpersonal difficulty (Criterion B); and the person is at least age sixteen years of age and at least five years older than the child or children (Criterion C). [May] meets Criterion A due to a history of recurrent thoughts and fantasies of prepubescent females as well as accessing and viewing child sexual exploitation material beginning in approximately 2020 and continuing until May 2024. [May] meets Criterion B due to a history of self-reported emotional disturbance and arrest related to these behaviors. [May] meets Criterion C as she was over the age of sixteen and at least five years older than the victims.

*Id.* Noticeably absent from this concerning diagnosis is a link between the diagnosis and her autism or any of her other mental health diagnoses.

Although May does not argue that her autism totally excuses her behavior in her sentencing memorandum, her statement to the FBI the day she was arrested is particularly noteworthy. During May's arrest by the FBI at her home in Pelham, NY, May physically resisted arrest and yelled, "you fucking pigs! You fucking pigs broke my door!" Gov't Ex. 4 at 1. While being transported to Connecticut by the FBI, May engaged in a conversation with FBI Special Agent ("SA") Courtney Benitez who was seated with May in the backseat. During that conversation, May indicated that

she believed that the FBI unlawfully entered her home and abducted her. In response, SA Benitez told May that the FBI entered the residence to arrest May pursuant to an arrest warrant. In response, May stated that she was too disabled to commit a crime. Gov't Ex. 1 at 1. May's assertion that she is too disabled to commit a crime is belied by her own actions in this case. Not only did May indicate that she was on her way to acquiring her teacher's assistant certificate, but May was also able to find her way onto the dark web to download her child pornography by using a Tor browser, which is not a simple process.

In sum, while it is certainly important that the Court consider the principle that sentencing should provide necessary treatment in the most effective manner, that is one of many factors laid out in Section 3553(a) that the Court should consider and apply to the facts and circumstances of this case. The Government submits that the BOP has the resources and the capability to provide May with the necessary treatment to continue on her path to recovery while serving any term of imprisonment the Court may order.

### C. Deterrence and protection of the public

A meaningful sentence of incarceration of at least 24 months also serves the purpose of promoting respect for the law, providing just punishment, and promoting deterrence, which has the secondary effect of protecting the public. Although May has expressed her understanding of the gravity of her actions and the harm that she caused to others, there is still a need for the sentence in this case to promote respect for the law. May's apparent belief that she is too disabled to commit a crime coupled with her reference to FBI agents as "fucking pigs" certainly evokes a lack of respect for the law and the officers that are charged with enforcing the law and protecting the community.

It is also important that the sentence here serves the purpose of deterrence, which is not limited to May. A strong sentence promotes general deterrence, which is important in this case because sex crimes against children are often significantly under-reported. Accordingly, it is of the utmost importance to deter those who may commit these types of crimes by imposing significant sentences on those perpetrators. *See e.g.*, *United States v. Nania*, 724 F.3d 824, 842 (7th Cir. 2013) ("The senseless acts of these criminals damage children for the rest of their lives. The government has understandably devoted considerable resources to deterrence—and that distinct objective warrants our attention."). Imposing a strong sentence in this case sends a clear message to deter other would-be offenders from engaging in similar conduct.

A sentence of at least 24 months' imprisonment, followed by a lengthy term of supervised release, is also necessary to protect the public from May. Despite her arguments to the contrary, a sentence of incarceration is necessary to protect the public from her impulsive actions that are directly attributable to her sexual interest in children. May posits the STAR Report created by Dr. Imhoff and Dr. Spence as a reason that the Court should give a more lenient sentence, arguing that a disruption in treatment will stunt the progress she has already made. *See* Def. Sent. Mem. at 26 ("[h]ere, as discussed above in the STAR Report and its appendices from Sasha's treatment providers, the combination of gender affirming medical needs […] ASD-related vulnerabilities, and trauma focused therapy makes uninterrupted, specialized outpatient care not simply beneficial but essential."). In her sentencing memorandum, May invokes the opinion of Dr. Spence, writing, "[m]easure for measure, home confinement—with mandated treatment—will protect the public more effectively than imprisonment, for custodial time will disrupt progress, heighten clinical risk, and produce poorer longer-term outcomes for the both the defendant and, therefore, the public." Def. Sent. Mem. at 27. While the Government is certainly sympathetic with Dr. Spence's position

that a break in May's treatment may inhibit progress and perhaps erode the progress May has already made, the notion that the public is less safe with May being incarcerated is belied by the underlying facts of this case. May was receiving treatment in the community when she committed the instant offense. May can do no harm to the public while incarcerated. As evident from this case, she can, however, harm the public outside of a BOP facility, regardless of the treatment plan she is on.

Although May argues that her rigorous and interdisciplinary treatment plan should assuage any fears that the Court may have about her danger to the community, it is worth noting that May was working with most of these providers *before* her arrest in this case, and presumably while she was engaging in conversations with the UCO.[5] In fact, of the nine (9) recommendations in the STAR Report, four (4) of the recommendations recommend continued treatment with specific medical providers whom May was already working with before her arrest.  For example, May writes, "[i]n this light, it must also be borne in mind that this rehabilitation is based on hard work in an intricately balanced wellness and recovery program over 100 biweekly sessions with Stefan Simanovich, her SO provider, alone since her arrest." Def. Sent. Mem. at 14. While the Government commends May on the steps she has taken to correct course while she is on pretrial release, it is important to note that she began her sex offender treatment with Mr. Simanovich in October 2023, several months before she initiated contact with the UCO.[6]  So while the

---

[5] "Sasha meets Criterion A due to a history of recurrent thoughts and fantasies of prepubescent females as well as accessing and viewing child sexual exploitation material beginning in ***approximately 2020*** and continuing until May 2024." *See* Def. Ex. 1 at 22 (emphasis added).

[6] The same can be said for May's work with many of her providers listed in the recommendations in the STAR Report (Def. Ex. 1). May began working with Karoyln Prisciandaro (recommendation #6 in the STAR Report), her speech language and cognitive therapy counselor when she was 11 years old, well before the offense conduct in this case. *See* PSR ¶ 77. Likewise, May began working with Dr. Melinda Wald (recommendation #4 in the STAR Report) in 2020, before the offense conduct in this case. The same goes for Dr. Rajveer Purohit (recommendation #8 in the STAR report). May has been working with Dr. Purohit since her vaginoplasty surgery since 2022, before the offense conduct in this case.

Government agrees that it is important that May continues her work with her team of providers as a part of her post-sentence treatment plan, the notion that this plan will entirely eliminate her danger to the community is undermined by the facts before the Court.

This position also overlooks the range of treatment options May will have in BOP custody and ignores the fact that May can, and should, resume her intensive and regimented treatment plan after completing any period of incarceration the Court orders. Simply put, May's ongoing and regimented treatment plan with providers of her choice and liking should not be the reason that she serves no jail time, allowing her to effectively escape the consequences of her actions. May's actions in this case prove that she is a danger to the public. Despite her claim that she is too disabled to commit a crime, the evidence before the Court proves otherwise and the sentence should reflect accordingly.

## IV.    CONCLUSION

For the reasons stated above, the Government respectfully submits that in balancing all the § 3553(a) factors, including those discussed above, just punishment in this case is a sentence of no less than 24 months of imprisonment—which is also the minimum sentence that May agreed to ask the Court to impose as part of her plea agreement—followed by a lengthy term of supervised release.

Respectfully submitted,

DAVID X. SULLIVAN
UNITED STATES ATTORNEY

_____
CHRISTOPHER J. LEMBO
FEDERAL BAR NO. phv207767
ASSISTANT U.S. ATTORNEY
157 Church Street, 25th Floor
New Haven, CT 06510

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically on February 2, 2026, and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_____
CHRISTOPHER J. LEMBO
ASSISTANT UNITED STATES ATTORNEY